Nancy M. BILLINGS, Plaintiff,

v.

TOWN OF GRAFTON, Russell J. Connor, Jr., Roger Hammond, Susan M. Mills, Christopher R. Lemay, Brook Padgett, and Peter Adams, Defendants.

Civil Action No. 02–40248–FDS.

United States District Court, D. Massachusetts.

July 5, 2006.

230

Richard A. Mulhearn, Law Offices of Richard A. Mulhearn, Worcester, MA, for Plaintiff.

David K. McCay, Richard C. Van Nostrand, Mirick, O'Connell, Demallie & Lougee, LLP, Worcester, MA, for Defendants.

## MEMORANDUM & ORDER ON DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

SAYLOR, District Judge.

This is a civil action arising out of the alleged sexual harassment of an employee of the Town of Grafton. Nancy Billings filed suit against the Town and her former supervisor, Russell J. Connor, Jr., for injuries arising out of Connor's alleged sexual harassment over a period of approximately three years. The original complaint asserted claims for sexual harassment and discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against the Town (Count I); for retaliation in violation of Title VII against the Town (Count II); for sexual harassment and discrimination in violation of Mass. Gen. Laws ch. 151B against both the Town and Connor (Count III); for retaliation in violation of ch. 151B against both the Town and Connor (Count IV);

and for intentional infliction of emotional distress against Connor (Count V).

Defendants filed a motion for summary judgment as to all counts on March 24, 2004. On May 3, 2004, Billings moved to amend her complaint to add five additional parties as defendants—the acting Town Administrator, Roger Hammond, and four members of the Town's Board of Selectmen, Susan M. Mills, Christopher R. LeMay, Brook Padgett, and Peter Adams—and to make additional allegations of retaliation based on events occurring after the lawsuit was filed. At the same time, she moved for an extension of time to complete discovery.

On March 14, 2005, the Court issued its memorandum and order granting summary judgment for defendants as to the claims for sexual harassment, discrimination, and intentional infliction of emotional distress (Counts I, III, and V). As to the retaliation claims (Counts II and IV), the Court deferred its ruling on the grounds that Billings did not yet have an opportunity to conduct full discovery. The Court granted Billings's motion to amend, which it treated as a motion to supplement. The Court also permitted the parties to conduct additional limited discovery.

On July 20, 2005, all defendants renewed the motion for summary judgment on Billings's remaining retaliation claims. For the reasons stated below, the renewed motion will be granted.[1]

## I. Factual Background

The facts are described in the light most favorable to the plaintiff.[2]

1. The newly named defendants did not move for summary judgment as to Count III (alleging sexual harassment) insofar as it was amended to include them. However, the count as amended is factually and legally indistinguishable from the count as brought against Connor and the Town, in whose favor the Court already granted summary judgment. Accordingly, for the reasons detailed in the Court's March 2005 memorandum and order, summary judgment will be granted in favor of the newly named defendants as to Count III. *See Young v. City of Providence ex rel. Napolitano,* 404 F.3d 4, 12 (1 st Cir.2005).

2. In April 2006, Billings filed a motion to supplement the summary judgment record to

## A. *Position as Secretary to the Town Administrator*

Russell J. Connor, Jr., was appointed Town Administrator by the Grafton Board of Selectmen on August 23, 1999. As Town Administrator, Connor was the town's top executive employee. He reported directly to the Selectmen.

In September 1999, Connor hired Nancy Billings as his part-time secretary. In May 2001, her position was classified as an exempt, full-time position, and she received a salary increase. It was, and apparently continues to be, a non-union position.

Billings testified that her duties included answering the telephone, filing, typing letters, opening the mail, and helping citizens who came into the office. She also testified that she helped town boards and commissions, and that, on occasion, she attended and took the minutes of the meetings of the Board of Selectmen to fill in for the secretary who usually did so. She had limited access to confidential information: it was her responsibility to open, stamp, and sort mail containing confidential information about legal issues and lawsuits involving the town, but she had no responsibility to review the correspondence or any substantive input into these issues.

Billings's work station was located in the Grafton Municipal Center. She shared an office with, and sat in a desk adjacent to, Nancy Hazen, the administrative assistant to the Selectmen.

## B. *Billings's Complaints of Sexual Harassment*

A few months after she was hired, Billings noticed that Connor began staring at her breasts with some regularity. She spoke with other employees about Connor's behavior, some of whom indicated that they had experienced the same thing and that it made them feel uncomfortable. However, in the early part of her employment, Billings did not discuss her discomfort with Connor or make a formal complaint. A full recitation of the facts relevant to her harassment claims can be found in the Court's March 15, 2005 memorandum and order, and will not be repeated here.

The Town's sexual harassment policy designated Hazen as the employee to whom complaints of sexual harassment should be made. In March 2001, Billings filed a formal complaint of sexual harassment with Hazen, who reported the complaint to one of the Selectmen. In response, the Selectmen asked town counsel Theresa Dowdy to investigate.

Dowdy interviewed Connor, Billings, and other women who had complained about Connor's behavior. In a letter to the Selectmen in April 2001, Dowdy reported that she had conducted her interviews and that Connor told her that he was unaware that he was staring at female employees' breasts, and that he would make a conscious effort to be aware of his eye contact. Connor knew by at least July 2001 that it was Billings whose complaint prompted the investigation.

According to Billings, this did not end Connor's inappropriate behavior. By letter dated November 16, 2001, to the then-Chairman of the Board of Selectmen, Billings again complained about Connor's conduct, and asked for another formal investigation. This time, the Selectmen asked town counsel Sharon P. Siegel to investigate the allegations. Siegel interviewed Connor and two Selectmen; she spoke to Billings twice, but Billings ultimately re-

include evidence regarding an event that allegedly occurred the preceding February. Defendants do not oppose the motion and seek to introduce additional evidence in re-

sponse. The Court will grant her motion to supplement and will consider the supplemental evidence offered by both sides.

fused to participate in the investigation on the grounds that Siegel could not fairly investigate her complaint.[3] Siegel reported to the Selectmen on December 18, 2001, that her investigation did not substantiate Billings's claim of sexual harassment as that term is defined by law, and recommended that the matter be closed.[4]

Around this time, on December 13, 2001, Billings filed a complaint of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). It is not clear when the fact of her MCAD complaint first became known to Connor or the other defendants; it may have been served on the Town in approximately March or April 2002.

Several months later, Billings again complained to the Selectmen about Connor. On March 20, 2003, she wrote a letter to Roger Demers, Chairman of the Board of Selectmen, which stated that Connor's "leering at [her] chest has not ceased." The letter listed eleven separate dates, beginning in January 2003, on which the staring occurred, and requested that action be taken to stop the behavior.[5] This allegation prompted the town to hire attorney Judy Loitherstein to look into the allegations. She was not retained as an attorney for the Town, but as an independent investigator. Loitherstein investigated and concluded that, in her opinion, Connor did not "leer" or "stare" at Billings's breasts on the eleven occasions set forth in the letter.[6]

In the meantime, Billings and Connor continued to work together. The working environment between the two became, understandably, strained.

## C. The Alleged Retaliatory Acts

Billings contends that Connor, Hammond, and the individually named Selectmen retaliated against her for complaining about Connor's actions. Specifically, Billings points to (1) Connor's increased scrutiny of her conduct and performance; (2) a reprimand by Hammond for opening confidential mail; (3) her involuntary transfer to another secretarial position; (4) the Town's refusal to reinstate her to her former position after Connors left the Town's employment; (5) Hammond's instruction that she avoid the Selectmen's office; and (6) Hammond's refusal to accommodate her absences in connection with this litigation. The alleged retaliatory acts occurred between November 2001 and February 2006.

---

3. Siegel's report indicated that Billings told her that she refused to participate because Billings had filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") and preferred to pursue her complaint in that forum. Billings eventually withdrew her case from the MCAD and filed a complaint with this Court.

4. According to Billings, Siegel's investigation was flawed because Connor was the only person she interviewed who had first-hand knowledge, and she simply adopted his version of events. Billings concedes that Siegel's investigation was hampered by the absence of complaining witnesses, but suggests Siegel could have conducted an independent survey of female town employees.

5. In addition to the eleven incidents identified, Hazen's logbook contains references to other complaints made by Billings from March 23, 2001, to August 13, 2003.

6. Loitherstein based this conclusion in part on Connor's behavior during her interview with him. She stated that Connor's eyes frequently "darted down and then back up again" and that he "frequently looked down toward [her] chest, but just as frequently looked down and to [her] right, or down and to [her] left," and occasionally looked up or up and away. Loitherstein did not get the impression that Connor was staring at her chest. She thus concluded that Connor may have been looking at Billings's chest involuntarily, perhaps as a result of a physical condition. She did not find "any sexual intent or undertone" to this conduct.

### 1. *Connor's Increased Scrutiny of Her Performance*

Billings first complains, based on three separate incidents,.that she has been unfairly subjected to increased scrutiny by Connor of her conduct and work performance. The first occurred on August 8, 2001. The day before, Billings had attended a Selectmen's meeting and asked a question about the appointment of Hammond to be the Director of Public Works. The next day, Connor called Billings into his office, shut the door, and accused her of attending the meeting and asking that question to embarrass and humiliate him.[7]

The other two occasions occurred on April 1, 2003. On that day, Connor issued two typed memoranda to Billings concerning performance issues. The first indicated that Billings had improperly placed mail in the Selectmen's correspondence file without Connor's first having reviewed it. The second concerned the apparent loss of computer files by Billings and indicated that she had made insufficient efforts to recover the files. Billings contends that these memoranda were issued without any basis and demonstrate an increased and unfair scrutiny of her work performance.

According to Connors, because Billings "ratcheted up the litigation" and was documenting everything that could be construed to help her cause, he felt he should also document incidents of problematic work performance. He concedes that in the absence of the litigation he would have handled the issues less formally—for example, by merely talking to her about the problems or detailing them in a handwritten note.[8]

### 2. *Hammond's Reprimand*

In February or March 2002, Billings opened confidential correspondence to the Town and placed it on a desk in full view. Although the content of the letter is disputed, it may have been from the Town's law firm, and may have concerned the litigation that Billings had brought against the Town and Connor. Another incident occurred on March 18, 2002, while Connor was on vacation, when Billings opened a letter that was marked "personal and confidential" from Connor's personal attorney concerning the MCAD complaint brought by Billings. According to Billings, she did not know that the letter was from Connor's personal attorney because she had never heard of him. When Billings realized who sent the letter, she and Hazen taped the envelope closed and placed it in Connor's inbox.

Billings testified that it was her job to open all of the mail that came to the Selectmen's office, whether it was marked "personal and confidential" or not. According to Billings, neither Connor nor the Selectmen had previously informed her of the attorney's existence, nor had they previously instructed her to stop opening mail marked "personal and· confidential." Both Billings and Hazen testified that the office protocol was for Billings to open the mail, date stamp it, and put it on the corner of Hazen's desk. Hazen would then read the mail and place relevant items in Connor's inbox. Hazen also testified that there was

---

7. Connor apparently invited Billings to ask the Selectmen whether they would agree with him that the question was intentionally embarrassing and humiliating. According to Billings, she did so, and none of the Selectmen agreed with Connor's assessment; each, however, asked Billings why she had not asked Connor the question privately before the meeting. Billings responded that she did not put herself in the position of being alone with Connor because of his improper behavior. According to Connor, Billings was motivated by political issues, including her disagreement with his August 2001 appointment of Hammond as the Director of Public Works.

8. Billings replied in writing to the two memoranda.

"quite a bit" of mail marked "confidential." Connor confirmed that Billings opened many letters from attorneys marked "personal and confidential" because most attorneys marked their bills that way.

Connor notified the Selectmen and the Town's counsel about the March letter-opening incident. Connor contends that, on Town counsel's advice, he initiated a formal disciplinary investigation of Billings and appointed Hammond to conduct it.[9] On August 20, 2002, Hammond submitted a report to the Selectmen detailing his investigation of the incident. Hammond's report stated that in late February or early March 2002, Selectman LeMay issued a verbal directive to Billings through Hazen that confidential mail coming into the office was to be opened only by the addressee. Hazen's testimony, however, is inconsistent with that statement. She testified that LeMay had come into the office on April 3, 2002, and, for the first time, instructed her not to open any mail that was marked "personal and confidential." Hazen relayed LeMay's instruction to Billings, as directed. According to Hazen, this represented a change in procedure for her and Billings with regard to personal and confidential mail. Subsequently, on April 23, 2002, LeMay issued a memorandum to Hazen and Billings to the same effect. Hazen thus testified that both the verbal and written instructions were given *after*

the letter-opening incident of March 18, 2002.

In any event, Hammond concluded that Billings opened the letter from Connor's attorney in violation of a prior directive she had received from LeMay that confidential mail coming into the office was to be opened only be the addressee. Hammond concluded that Billings should be disciplined; as a result he gave her a written reprimand on September 12, 2002, that was placed in her personnel file. There is no evidence concerning what effect, if any, the reprimand has had or might have on her employment.

### 3. *Involuntary Transfer*

In May 2003, the Town offered Billings a position as a clerk in the Assessor's Office, and then in approximately November 2003, she was offered the Recreation Department secretary position. She turned down both, as she considered them demotions.

Approximately one year after Billings filed her original complaint, on December 22, 2003, the Town transferred her against her wishes to her current position as a secretary in the Recreation Department. Her basic compensation and benefits remain the same.[10] However, she now receives overtime pay when she works extra hours. Her basic duties as a secretary

9. According to Connor, because the incident involved his personal mail, he recused himself and appointed Hammond to conduct the investigation as the acting Town Administrator. Connor admitted that he would have handled the matter differently if Billings not filed "false allegations of sexual harassment" against him: he would have confronted her directly. The Board of Selectmen voted on June 4, 2002, to have Hammond conduct a formal investigation and report his findings to them.

10. The job grade for Billings's current position is S-1. The "S" in the job grade means staff. The job grade for her former position

was M-1. "M" means management. The pay scale for a Grade S-1 position is from $19,657.86 to $23,207.50, but the pay scale for a Grade M-1 position is from $28,472.54 to $33,614.09. Billings is currently paid above the salary range of her current position. She argues that her opportunity for future salary increases has been hindered by the transfer. However, the Town has submitted evidence—which Billings does not controvert—that in her new position she has enjoyed, and will continue to enjoy, the same salary increases that she would have received in her old position, irrespective of the change in her formal job classification. Although Billings points out that this arrangement is

remain the same: typing, copying, answering phones, and assisting the public either in person or by phone. In addition, she maintains the Recreation Department webpage.

Billings states that the position was in fact a demotion for several reasons. First, the status and prestige of the position is lower because she now reports to the Recreation Department Coordinator (who reports to the Town Administrator), instead of directly to the Town Administrator, and because she no longer opens and sorts confidential mail dealing with matters of significance to the Town. The only confidential information that she handles now is medical and financial information of recreation program participants.[11] Second, the majority of her time in her current position is spent doing routine tasks, such as typing and copying. Third, in her new position she is required to be a member of the union; as a result, union dues of $8.10 per week are deducted from her paycheck and she has to punch a time card instead of simply keeping track of her hours in writing.

The Town contends that her involuntary transfer came as the result of a medical accommodation that it decided to provide to Connor. In the fall of 2003, Connor began to experience health problems. First, he suffered a severe heart attack, was hospitalized, and was placed on medical leave. He then attempted to return to work, but suffered an atrial fibrillation, resulting in his further hospitalization. He requested accommodations for his medical condition, including a request that the Town reduce the stress to which he would be subjected upon his return. In support of the request, Connor's psychologist opined in a letter to the Selectmen dated December 2, 2003, that "were Mr. Connor to return to his position as Town Administrator while Mrs. Billings is still employed by the Town as Secretary of the Town Administrator, it would likely result in significant jeopardy to his health and his need to cease his employment status." Connor's physician added in a letter to the Selectmen dated December 5, 2003, that Connor "should [work] in a less stressed environment," noting that "[h]e states that there have been some stressful situations at work and I think in anyway [sic] that they could be avoided that would certainly be best for Mr. Connor's health."[12]

subject to collective bargaining, as it is a unionized position, there is no reason from the record to believe that the arrangement will not continue.

11. As further evidence of a drop in status, Billings points to (1) the fact that the minimum qualifications for the position as secretary to the Town Administrator are higher than those for her current position and (2) differences in the responsibilities of the positions as stated in their respective job descriptions. The job description for her previous position includes, among other things, responsibilities to act as the liaison between the Town Administrator and the public or other town departments; to assume administrative authority in the absence of the Town Administrator; to research records and files; to compile data; to monitor budgetary performance; to assign certain work to clerical workers and monitor their progress; and to respond to and resolve problems or difficulties. Billings did not testify one way or the other as to whether she actually performed the duties listed in the job description. Her current job description does not reflect these duties.

12. Billings complains (1) that the Town did not conduct any independent medical evaluation of Connor; (2) that the letter from the psychologist had an advocative tone (e.g., he recited Connor's view that the case against him was meritless and brought for improper purposes) rather than a clinical, or dispassionate, tone; and (3) that the letters did not spell out other work restrictions or indicate how long the accommodation should be in place. She also argues that Connor wrongly refused to provide certain information to her in discovery regarding the nature and treatment of his medical condition. Whatever the

The Selectmen considered the accommodation request during at least two meetings at which Hammond was present. Selectman Padgett testified that the Board considered possible alternative responses to the request. Hammond's testimony is contradictory: he answered "no" to the question of whether there were "any alternatives discussed, other than to remove her from the secretary's position and put her someplace else." [13] Hammond and the Selectmen were aware of Billings's lawsuit against the Town and Connor at this time; one Selectmen testified that he was concerned about transferring Billings because he feared that it would be perceived to be retaliatory (even though he did not believe that the transfer was in fact retaliatory).

According to the Town, it needed to transfer either Billings or Connor. Billings could be transferred to an equivalent position where the same status, pay, hours, and benefits could be maintained, but there was no position equivalent to that of Town Administrator to which Connor could be transferred. Accordingly, in December 2003, Hammond, the acting Town Administrator—at the direction of Selectmen Mills, LeMay, Padgett, and Adams—transferred Billings to a secretarial position in the Recreation Department. She was told that she was being transferred so that the Town could accommodate Connor's medical condition. With the permission of his physician, Connor returned to work part-time on December 22, 2003.

### 4. The Town's Refusal to Re–Transfer Billings after Connor's Departure

After Billings was transferred, the Town advertised her former position and inter-

viewed candidates. It hired Cindy Ide effective March 1, 2004. Since that time, she has performed well in that position.

Connor is no longer Town Administrator; his last day was February 24, 2006. The new Town Administrator started in April 2006.

Billings requested reinstatement to her former position effective the day after Connor's departure. The Town responded that her former position was filled by a permanent employee and denied her request. Hammond—who made the decision after discussing the request with the Board of Selectmen and town counsel—testified that it was not in the best interests of the Town. Granting her request would have meant transferring two employees (Billings and Ide) who were both performing well in their current positions. Billings considers this refusal a further act of retaliation. Hammond contends that it was a decision made solely to facilitate the efficacy and continuity of Town operations.

### 5. The Instruction to Avoid the Selectmen's Office

According to Billings, as of January 2004, Hammond barred her from being in the Selectmen's office for any reason whatsoever, even though she had legitimate work reasons to be there, in order to prevent interaction between her and Connor. Hammond testified that he believed this was necessary to accommodate Connor upon his return from medical leave. This directive caused Billings to miss a training session regarding maintenance of the Town webpages. Hammond also instructed Hazen not to socialize with Billings on work time. Whenever she needs to speak

---

merits of her position as to the latter issue, her assertion of it is clearly untimely.

**13.** In addition, Hammond testified that they also discussed "whether it would be possible

to transfer Mr. Connor to some other position" and that doing so wasn't "feasible" because there were no equivalent positions.

to Hazen, she has to knock on the door and wait for her to come outside.

### 6. The Refusal to Accommodate the Litigation

Billings contends that the Town required her to use personal time to attend her deposition and the mediation of this case, but did not require other employees who were deposed to do so. She also complains that Hammond criticized her for failing to provide no more than a day's notice that she would be attending the mediation, despite the fact that he knew that she was required to attend.

### D. Investigation of Claims of Retaliation

Billings reported some of the alleged retaliatory acts to Loitherstein during the course of the spring 2003 investigation. In August 2003, Loitherstein obtained permission from the Town to investigate those allegations. In her report dated October 15, 2003, Loitherstein cited three occasions where Connor learned of a complaint by Billings and subsequently addressed performance issues with her that otherwise might have been left unaddressed or addressed in a less formal way.[14] Loitherstein found that Connor did not intend to treat Billings differently out of any animus or sense of revenge but felt constrained in addressing performance issues with her in light of her complaint against him. Loitherstein did not believe, however, that there was any tangible effect on Billings's job.

### E. Complaint of Retaliation with the MCAD

On March 5, 2004, Billings filed a retaliation charge with the Equal Employment Opportunity Commission ("EEOC") and the MCAD based on the alleged adverse action taken against her after she filed her first MCAD complaint, including, primarily, the involuntary job transfer. Billings asked both the MCAD and the EEOC to dismiss the new retaliation charge upon filing to allow her to move to add the claim to this case. On April 8, 2004, the EEOC issued a notice of right to sue. As noted above, the Court granted leave to supplement her complaint to add further allegations of retaliation.

## II. Legal Analysis

### A. Standard of Review

■ The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court

14. The first occasion was Connor's discussion with Billings about her question at the August 2001 Selectmen's meeting, which occurred shortly after he learned that Billings accused him of sexual harassment. The second was Connor's report to the Selectmen regarding the letter-opening incident, which occurred within a few weeks of the service of Billings's MCAD complaint. The third was the issuance of the two memoranda to Billings on April 1, 2003, which occurred shortly after Connor learned that Billings had sent a letter to the Selectmen accusing him of continued harassment.

must view the entire record in the light most hospitable to the nonmoving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993).

## B. *Retaliation*

Counts II and IV of the complaint assert claims of retaliation under Title VII and Mass. Gen. Laws Chapter 151B, respectively.

The anti-retaliation provisions of Title VII state as follows:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e–3(a). Similarly, Chapter 151B provides that it is an unlawful practice "[f]or any person [or] employer ... to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under [Chapter 151B]," § 4(4), or "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by [Chapter 151B]," § 4(4A).

■ A plaintiff must establish three elements to prove a *prima facie* case of retaliation under either statute. Under Title VII, the plaintiff must establish that (1) she engaged in protected conduct, (2) she suffered a materially adverse action in that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," and (3) there is a causal connection between the protected activity and the adverse action. *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. ——, 126 S.Ct. 2405, 165 L.Ed.2d 345, 2006 WL 1698953, at *10 (June 22, 2006);

■ *Noviello v. City of Boston,* 398 F.3d 76, 88 (1st Cir.2005).[15] Under Chapter 151B, the first and third elements of the *prima facie* case are the same; the second element apparently requires that there be a materially adverse employment action. *See MacCormack v. Boston Edison Co.,* 423 Mass. 652, 662, 672 N.E.2d 1 (1996) (plaintiff must establish adverse employment action "substantial enough to count as the kind of material disadvantage that is a predicate for a finding of unlawful retaliation"); *Ritchie v. Dep't of State Police,* 60 Mass.App.Ct. 655, 664 & n. 16, 805 N.E.2d 54 (2004) (plaintiff must show that she suffered an "adverse employment action"; in the case of claim for coercion, intimidation, or threats under § 4(4A), the threat itself suffices to meet this prong).[16]

The claimed retaliatory actions in this case are clearly connected to Billings's employment, so the distinction between the statutes is not significant here. The primary issue, as fully explained below, is whether a jury could find that they are *materially* adverse.

---

**15.** In *Burlington Northern,* the Supreme Court resolved a disagreement among the circuits as to whether the alleged retaliatory action must be related to the plaintiff's employment and the "level of seriousness to which [the harm from the action] must rise before it becomes actionable retaliation." 548 U.S. ——, 126 S.Ct. 2405, 2408–09, 2414–15, 165 L.Ed.2d 345. The Court held that Congress intended that the alleged retal-

iatory action "produce[] an injury or harm;" that harm must transcend the "trivial" and rise to the level of harm that is "materially adverse." *Id.* at 2414–15.

**16.** *But see Mole v. Univ. of Massachusetts,* 442 Mass. 582, 591 & n. 14, 814 N.E.2d 329 (Mass.2004) (stating that plaintiff must show "some adverse action"; issue in case did not concern this element, however, but causation).

■ Under both statutes, once the plaintiff has established this *prima facie* showing, defendant must articulate a legitimate, nonretaliatory reason for its action in order to avoid summary judgment. *Valentin–Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 95 (1st Cir.2006); *Mole*, 442 Mass. at 591, 814 N.E.2d 329. If the defendant meets this burden, plaintiff must show that the decision was a pretext for the defendant's retaliatory animus. *Valentin–Almeyda*, 447 F.3d at 95; *Mole*, 442 Mass. at 591, 814 N.E.2d 329; *see also Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 121, 731 N.E.2d 1075 (2000) (plaintiff must show that the employer's "desire to retaliate against [him] was a determinative factor in its decision."). The fact that a plaintiff is unable to establish an underlying discrimination claim-which the Court previously concluded with respect to Billings's sexual harassment claim—does not mean that she cannot establish a claim for retaliation. *Mesnick*, 950 F.2d at 827; *Abramian*, 432 Mass. at 121–22, 731 N.E.2d 1075.

Here, there is no dispute that Billings engaged in protected activity. The parties disagree, however, as to whether Billings has satisfied the second and third elements of a retaliation claim. Specifically, defendants contend that Billings did not suffer a materially adverse action because her transfer to her current position was a lateral move with no loss of compensation, benefits, or other material accouterments of employment. Defendants also argue that the other retaliatory acts of which she complains do not rise to a materially adverse action. Finally, defendants argue that her transfer, the Town's recent refusal to reinstate her, and the other acts of which she complains were not causally connected to her sexual-harassment complaints.

#### 1. Materially Adverse Action

The first issue is whether the acts alleged to have been taken against Billings rise to the level of a "materially adverse" action such that it "well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." [17] *Burlington Northern*, 548 U.S. ——, 126 S.Ct. 2405, 2414–15, 165 L.Ed.2d 345; *see also MacCormack*, 423 Mass. at 662, 672 N.E.2d 1 (action must be to plaintiff's material disadvantage).

■ Adverse employment actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Hernandez–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir.1998); *see MacCormack*, 423 Mass. at 662, 672 N.E.2d 1 (requiring a materially disadvantageous change in working conditions). Whether an action is adverse is measured by an objective standard. *Bur-*

---

17. Billings also argues that, under M.G.L. c. 151B, § 4(4A), retaliation claims can be based on allegations of coercion, threats, intimidation, and interference, which do not require proof of an adverse employment action. *See Mole*, 442 Mass. at 592 n. 14, 814 N.E.2d at 339 n. 14 ("Under § 4(4A), adverse action is any action 'to coerce, intimidate, threaten, or interfere with' the plaintiff."); *Ritchie*, 60 Mass.App.Ct. at 664–65 & n. 16, 805 N.E.2d 54 (same). Billings has not argued that any of the acts of which she complains coerced, intimidated, threatened, or interfered with her in the exercise or enjoyment of her rights under 151B. In any event, the requirement of materiality also applies to § 4(4A) actions. *See Bain v. City of Springfield*, 424 Mass. 758, 760, 765–66, 678 N.E.2d 155 (supervisor's communication to plaintiff that mayor told supervisor to "get rid of" her, in context of supervisor's reprimand that she not go over his head to criticize mayor, constituted actionable threat or intimidation; mayor's actions that suggested that he was avoiding plaintiff, and was acting cold or hostile towards her, did not).

**240**

*lington Northern*, 548 U.S. at ——, 126 S.Ct. 2405, 2414–15; *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 23 (1st Cir. 2002); *MacCormack*, 423 Mass. at 663, 672 N.E.2d 1. Where an adverse action is alleged to have occurred in the workplace, it is materially adverse if the employer "(1) take[s] something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold[s] from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for a promotion after a particular period of service." *Blackie v. Maine*, 75 F.3d 716, 725–26 (1st Cir.1996) (citations omitted). The "creation and perpetuation of a hostile work environment" can also constitute a materially adverse action under Title VII and Chapter 151B. *Noviello*, 398 F.3d at 88.

▮ An ostensibly lateral job transfer can be a materially adverse action if it is in substance a demotion. *Marrero*, 304 F.3d at 23. In *Marrero*, the First Circuit explained that "a transfer or reassignment that involves only minor changes in working conditions" normally is not actionable, even if it causes the plaintiff to feel "stigmatized and punished." *Id.* at 23–25. But a transfer that results in an objectively "more tangible change in duties or working conditions" can be a materially adverse action. *Id.* at 25 (internal quotation omitted). Similarly, a change in the type of work that an employee performs does not always equal a demotion—particularly when the perceived adverse change is based on the employee's subjective preferences as opposed to a change in responsi-

bilities so significant as to constitute a setback to the employee's career. *See Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir.1980) (finding an adverse employment action where the transfer would have radically changed the nature of plaintiff's work and rendered useless her 20 years of experience and specialized study), *cited with approval in Marrero*, 304 F.3d at 24.

▮ In most respects, Billings's current position is equivalent to her prior position. She enjoys the identical salary and benefits; even her opportunity for future salary increases remains substantially the same.[18] Her duties are, for the most part, the same in both positions: typing, copying, answering the telephone, and assisting the public. It is true that her new position is slightly less prestigious than working for the Town's highest executive employee, and that her current job (on paper) requires lesser qualifications. An objectively reasonable loss of prestige is one factor suggesting that a change of duties may constitute a materially adverse action. *Burlington Northern*, 548 U.S. ——, 126 S.Ct. 2405, 2416–17, 165 L.Ed.2d 345 (plaintiff's former job duties required more qualifications, which was an indication of higher prestige, and were objectively considered better than her new duties; this, in addition to the fact that her new duties were "by all accounts more arduous and dirtier," supported jury verdict in her favor). Here, however, the difference in prestige is objectively slight, and Billings's complaints arise largely out of her own subjective feelings of disappointment. *See MacCormack*, 423 Mass. at 663, 672 N.E.2d 1.[19] Furthermore, she did not

**18.** The only apparent financial difference is the fact that in her new position she is required to pay union dues.

**19.** Similarly, in *Serna v. City of San Antonio*, the plaintiff police officer contended that his transfer from a foot and bike patrol unit to a

patrol unit in another part of the city was an adverse employment action for purposes of his First Amendment retaliation claim because the former assignment was considered to be prestigious and the plaintiff personally preferred it. 244 F.3d 479, 483–84 (5th Cir.

have more onerous duties in the new position, or indeed very different duties at all. It is true that she was no longer able to handle mail that included highly confidential information concerning legal matters and lawsuits. But she admitted that in her former position she had no substantive input into these matters, and indeed that she was not even required to review the correspondence. Nor is there any evidence that this occupied any substantial amount of her time.

On the whole, her loss of job responsibilities, and the episodic and more formalized criticism that she encountered from Connor, are similar to the facts detailed by the First Circuit in *Marrero*. In that case, plaintiff's transfer to another secretarial position came with more work for her (that appeared to be temporary), an increased scrutiny of her performance, a probationary period to ensure that she could handle the new duties, and an instruction not to handle certain confidential mail and phone calls. The First Circuit concluded that the transfer was not a materially adverse employment action, judged by an objective standard, because the changes did not amount in substance to a demotion. 304 F.3d at 25. It was not enough that the plaintiff felt "stigmatized and punished by the transfer." *Id.* By the same token, the facts of Billings's transfer are far removed from those cases where courts have found that the plaintiffs did suffer materially adverse actions as a result of a job transfer or the removal of significant responsibilities. *See, e.g., Melendez–Arroyo v. Cutler–Hammer de P.R. Co.,* 273 F.3d 30 (1st Cir.2001); *cf. Simas v. First Citizens' Federal Credit Union,* 170 F.3d 37 (1st Cir.1999).

The fact that Billings's reporting structure also changed does not require a dif-

ferent conclusion. For example, in *Flaherty v. Gas Research Institute*, the plaintiff argued that the fact that in his new position he report to a former subordinate, whereas he previously reported to a senior vice president, demonstrated that a facially lateral transfer was in substance a demotion. 31 F.3d 451, 457 (7th Cir.1994). The Seventh Circuit disagreed, reasoning that the change was "largely semantic where the employee's salary, benefits, and level of responsibility would remain unchanged." *Id.* Being placed lower on the organizational totem pole may have bruised plaintiff's ego, but it was not enough to establish a materially adverse employment action. *Id.* Likewise, in *MacCormack*, the plaintiff claimed that a department reorganization that resulted in a different reporting structure for him was a retaliatory adverse employment action. 423 Mass. at 661, 672 N.E.2d 1. The Supreme Judicial Court ruled that plaintiff's complaints "amount[ed] to no more than subjective feelings of disappointment and disillusionment" because he did not establish that "he had been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment." *Id.* at 663, 672 N.E.2d 1.

■■■ The other evidence, whether considered individually or as a whole, does not amount to a materially adverse action. In the context of this case, "[t]o be adverse, an action must materially change the conditions of plaintiff['s] employ." *Gu v. Boston Police Dep't,* 312 F.3d 6, 14 (1st Cir. 2002). There is no evidence that her prohibition from the Selectmen's office or the ban on social contact with Hazen during office hours have materially affected her. In any event, they are not materially adverse actions under the circumstances. Likewise, the criticism about her job per-

2001), *cited with approval in Marrero,* 304 F.3d at 25. The court held that these subjective criteria were insufficient to establish that

plaintiff suffered an adverse employment action. *Serna,* 244 F.3d at 485.

formance and the reprimand, while certainly unpleasant, were not shown to have had any tangible impact on her employment or future employment relationship. *See Hernandez–Torres*, 158 F.3d at 47 (supervisor's admonition to complete work within a specified time period "or else" not an adverse employment action); *Rodriguez v. Potter*, 419 F.Supp.2d 58, 66 (D.P.R.2006) (formal warning letter, not accompanied by any loss of pay or benefits, and not used as a precedent to any other action, not an adverse employment action); *Bain*, 424 Mass. at 765–66, 678 N.E.2d 155 (that mayor acted "coldly" or had hostile body language toward city employee, and that her supervisor "second-guessed her" were "subjective and intangible impressions" that could not be considered retaliatory actions); *cf. Noviello*, 398 F.3d at 89 (for retaliatory harassment to be actionable, it must be so severe or pervasive to materially alter the conditions of plaintiff's employment); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 54–55 (1st Cir.1999) (for statute of limitations purposes, a negative performance evaluation will not trigger the running of the statute unless the plaintiff is on notice of its "tangible consequences").[20] None of the acts are likely to dissuade an objectively reasonable person in plaintiff's position from complaining about unlawful acts of discrimination. *See Burlington Northern*, 548 U.S. at ——, 126 S.Ct. 2405, 2410–11.

█ Finally, because her transfer did not rise to the level of a materially adverse action, the Town's refusal to reinstate her to her prior position cannot be one either. *See LePique v. Hove*, 217 F.3d 1012, 1013–

14 (8th Cir.2000); *Craven v. Texas Dep't of Criminal Justice*, 151 F.Supp.2d 757, 766 (N.D.Tex.2001).

Plaintiff has thus failed to establish facts sufficient to support the second element of her retaliation claim.

### 2. *Causation*

The final element of plaintiff's retaliation claim is causation. Billings must establish facts sufficient to show that a causal connection existed between her protected conduct and the allegedly adverse actions. *Mesnick*, 950 F.2d at 828; *see Abramian*, 432 Mass. at 121, 731 N.E.2d 1075.

█ Billings's principal causation argument is straightforward: she argues that her complaints against Connor were the *only* reason that she was transferred to the Recreation Department. In the "but-for causation" sense, that is literally true. If not for her complaints, Connor would not have obtained a medical opinion that a separation from Billings was necessary for his health, and the Selectmen would not have made the decision to transfer her. However, while that is sufficient to establish the element of causation for purposes of a *prima facie* case, it is not enough to survive summary judgment.

█ Defendants have articulated a non-retaliatory reason for the decision to transfer Billings: the transfer was an accommodation to the health-related concern raised by Connor's physicians. They have also articulated a non-retaliatory reason for the decision not to reinstate her to her prior position: the fact that a new employee had been hired for that position and

---

**20.** Connor's more formal treatment of Billings after the filing of the lawsuit appears to be a normal response to a naturally awkward situation, not a materially adverse action. It is unrealistic to think, even under the best of circumstances, that parties on the opposite sides of litigation would not interact with each other somewhat more formally or stiffly.

*See, e.g., Bain*, 424 Mass. at 759–61, 765–66, 678 N.E.2d 155 (after plaintiff charged mayor with bypassing her for a position because of "blatant discrimination," he acted coldly toward her, avoided making eye contact and talking directly to her, and discounted the things she said in a meeting with others; this was not actionable retaliatory conduct).

therefore substantial disruption would ensue from a reinstatement. Accordingly, Billings must proffer sufficient evidence that "the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext" for a desire to retaliate. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation omitted); *accord Mole*, 442 Mass. at 591, 814 N.E.2d 329. At that point, whether judgment is appropriate will depend on a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097.

▋ In short, to survive summary judgment, Billings must put forth evidence that the stated reasons for the transfer were pretextual. It is not enough that her allegations of sexual harassment set in motion a chain of events that led to her transfer.

▋ Billings does not dispute that it was the Selectmen, not Connor, who made the decision to transfer her. She does not offer any evidence to suggest that their decision was somehow not independent. Furthermore, she has offered no evidence that any of the Selectmen acted out of a retaliatory animus.[21] Indeed, Billings has not controverted the only evidence in the record as to the stated reason for the transfer: two medical professionals expressed the opinion that Connor's stress level needed to be reduced, and one specifically stated that Connor needed to be separated from Billings in the work environment.[22]

The Selectmen's decision was also objectively reasonable under the circumstances. Clearly something had to be done; it was unrealistic to expect that Connor and Billings, under the circumstances, would work together amicably and indefinitely. The Selectmen could not transfer Connor, as there was no comparable position anywhere in the Town. They could have credited Billings's accusations, and discharged Connor for cause; but at the time the decision was made, three successive internal investigations had failed to substantiate her claims.[23] Instead, the Selectmen chose to transfer Billings to a reasonably comparable position without any loss of pay or benefits.[24] While it was not a per-

---

**21.** The fact that one Selectman (who is not a defendant) dissented on the grounds that the transfer might be perceived to be retaliatory is not evidence of retaliation; in fact, he testified that he did not believe that it was retaliatory.

**22.** The fact that the Selectmen twice offered her voluntary transfers to other secretarial positions—which she refused—does not change the analysis. Ordinarily, an offer of a lateral transfer by an employer to an employee who had sued her direct supervisor for sexual harassment would reflect appropriate concern for the well-being of the employee. The fact that she was not involuntarily transferred at the time she refused the offers, but continued to work in her position for many more months (and that she was not involun-

tarily transferred until after Connor's heart attack and medical request), does not suggest in any way retaliatory animus by the Selectmen.

**23.** Her allegations of retaliation by Connor had also been discredited by an independent investigator.

**24.** Billings complains that the transfer decision was made without seeking an independent medical evaluation, and without much, if any, discussion as to possible alternatives. However, she has not put forth any evidence to controvert those medical opinions or to identify any alternative, such as a position to which Connor could reasonably have been transferred.

fect solution, it was objectively reasonable, and Billings has put forth no evidence that it was pretextual or otherwise based on retaliatory animus.

Her other causation arguments may be disposed of summarily. She essentially alleges that, in addition to the transfer, other adverse actions (e.g., her reprimand for opening mail, the bar from the Selectmen's office, the charging of personal time in connection with the lawsuit, and the more formal treatment by Connor) were taken in retaliation for her complaints of sexual harassment. Her causation argument is largely based on the temporal relationship of various events: she contends that each of her complaints of harassment was followed by an action taken against her.[25]

As set forth above, those events do not amount to materially adverse actions under the circumstances of this case. Moreover, even assuming that Billings can establish *prima facie* causation, in each instance there is uncontroverted evidence of a non-retaliatory reason and an absence of evidence as to pretext. The bar from the Selectmen's office was ordered by Hammond in order to effectuate a complete separation of Connor from Billings. The charging of personal time was also ordered by Hammond, on the basis that Billings (who was the plaintiff) was not on Town business during her deposition and mediation, but that other employees (who were mere fact witnesses) were. The reprimand was issued by LeMay after Billings admittedly opened mail marked "personal and confidential." Finally, while Connor admitted that he treated her more formally be-

cause of the lawsuit, as noted above, that was a normal reaction to the tensions inherent in the circumstances, and cannot form the basis of a claim of retaliation.

To summarize, there is no question that the transfer of Billings from the Town Administrator's office to the Recreation Department was directly related to her complaints of sexual harassment. Nonetheless, it is not actionable retaliation. The transfer was not a materially adverse action because it was not in substance a demotion and did not otherwise involve material changes in her work environment. Furthermore, according to the uncontroverted evidence, the transfer decision was made by the Board of Selectmen in response to independent medical recommendations that were not motivated by a retaliatory animus. Defendants' motion for summary judgment will therefore be granted.

### III.  *Conclusion*

For the reasons set forth above, Plaintiff's Motion to Supplement Summary Judgment Record to Include Additional Allegations of Material Fact Concerning Post–Motion Events is GRANTED and Defendants' Renewed Motion for Summary Judgment on Plaintiff's Retaliation Claims is GRANTED.

**So Ordered.**

---

**25.** "The mere fact that one event followed another is not sufficient to make out a causal link" of retaliation. *Mole,* 442 Mass. at 592, 814 N.E.2d 329 (quoting *MacCormack,* 423 Mass. at 662 n. 11, 672 N.E.2d 1). This is true even as to events that follow closely in time. "Were the rule otherwise, then a dis-

gruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint." *Mesnick,* 950 F.2d at 828; *accord Mole,* 442 Mass. at 592, 814 N.E.2d 329.