# United States Court of Appeals

## For the First Circuit

No. 06-2145

NANCY M. BILLINGS,

Plaintiff, Appellant,

v.

TOWN OF GRAFTON; RUSSELL J. CONNOR, JR.; PETER ADAMS,
Selectman for the Town of Grafton; ROGER HAMMOND;
CHRISTOPHER R. LEMAY, Selectman for the Town of Grafton,
SUSAN M. MILLS, Selectman for the Town of Grafton;
BROOK A. PADGETT, Selectman for the Town of Grafton,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Circuit Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

Richard A. Mulhearn, with whom Law Offices of Richard A.
Mulhearn, P.C. was on brief, for appellant.
Richard C. Van Nostrand, with whom David K. McCay and Mirick,
O'Connell, DeMallie & Lougee, LLP were on brief, for appellee.

February 7, 2008

**HOWARD**, **Circuit Judge**. Nancy M. Billings, the former secretary to the Town Administrator for Grafton, Massachusetts, appeals from the entry of summary judgment in favor of the Administrator, the Town, and its Board of Selectmen on her claims of a hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a) (2003), and its state law analog, Mass. Gen. Laws Ann. ch. 151B, §§ 4(1), 4(4A) (2004). The district court ruled, as a matter of law, that (1) the Town Administrator's alleged staring at Billings's breasts did not make her workplace atmosphere hostile, (2) her transfer to another secretarial position within the Town, among other things, after she complained of the Administrator's behavior did not amount to a materially adverse employment action, and (3) those actions were not motivated by retaliatory animus. We find error in these rulings, and vacate the decision in large part and remand for further proceedings.

## I.

We review the district court's entry of summary judgment de novo. See, e.g., Colt Def. LLC v. Bushmaster Firearms, Inc., 486 F.3d 701, 705 (1st Cir. 2007). "In so doing, we take as true the facts documented in the record below, resolving any factual conflicts or disparities in favor of the nonmovant." Id. We state the following background facts in accordance with that standard.

-2-

Billings began working as the secretary to the Grafton Town Administrator, Russell J. Connor, Jr., in September 1999. A few months into the job, Billings began to notice that Connor was looking at her chest during their conversations. According to Billings, Connor would "make eye contact, and then his eyes would shift down to [her] chest. It was always the same." Connor would then stare for approximately five seconds, or what "seem[ed] like a long time" to Billings.

In response, Billings avoided being alone with Connor, and held a piece of paper in front of her chest while walking through the office. Connor once stared at Billings so many times in the first half-hour of her workday that she went home to change out of the sweater she was wearing before returning. On that same day, Billings formally complained about the incident to the Town's sexual harassment officer, Nancy Hazen, who worked with both Billings and Connor in the Office of the Grafton Board of Selectmen, as the Board's secretary. Hazen had previously heard accounts of similar behavior on Connor's part: in a conversation with Hazen in the winter of 2000, Billings and a clerk to the Grafton assessor had mentioned that Connor looked at their breasts while talking to them, and, while out to dinner with Hazen that fall, Billings, the assessor, her clerk, and a clerk to the tax collector all had said that Connor had stared at their breasts.

Billings's formal complaint reached the Board of Selectmen, which instructed her to contact an attorney at the Town's law firm. Billings, along with the two clerks who had previously mentioned Connor's staring to Hazen, told the attorney that Connor "was leering at [their] chests, and that it was occurring frequently and that it wasn't stopping, and [they] wanted it to stop." Hazen, for her part, started keeping a written record of Billings's reports of Connor's staring at her chest. Hazen noted four separate incidents in one two-week span in the early spring of 2001, including one where Billings "stormed out of [Connor's] office slamming papers saying 'He did it again.'" On a separate occasion, Connor told the tax collector's clerk that Billings was "under the desk" where Connor was sitting when he was asked her whereabouts. Connor, who quickly added that he was "kidding," later acknowledged that his comment could have been taken to suggest that Billings was under the desk performing oral sex, though he denied having meant it that way. But Billings, who soon learned of Connor's remark from the clerk, found it offensive.

Billings noticed that Connor's staring became less frequent after the Town's attorney reported to the Board of Selectmen regarding her inquiry into Billings's complaint,[1] decreasing from a number of times each day to "a couple of times a

---

[1] In her report, the attorney did not state any conclusions as to the accuracy of the women's complaints, but simply expressed the hope that letting Connor know of them would "resolve the matter."

-4-

week." But the staring returned to its former frequency after a few weeks. That August, after calling Billings into his office and closing the door, Connor accused her of trying to embarrass and humiliate him by asking questions at a Board of Selectmen meeting about his appointment of a new public works director, Roger Hammond. Billings came to see this as retaliation for making the sexual harassment complaint; one of the Selectmen had recently disclosed to Connor that Billings was the complainant. After this disclosure, Billings noticed that Connor began avoiding her around the office and using written notes and "grunts" to communicate.

Billings reported a number of additional instances of Connor's staring at her chest in the late fall of 2001. In November, she informed the Board of Selectmen "that the conduct has not stopped" and asked the Board for a "formal investigation." The Board instructed the Town's labor lawyer to look into this claim, but Billings refused to participate in the investigation out of a concern that the lawyer's representation of the Town would bias the lawyer in its favor. The lawyer thus did not interview Billings, and also did not interview any of the other women who had previously said Connor had stared at their chests. Based on interviews with Connor and two members of the Board of Selectmen, the lawyer found that Connor had not stared at Billings's chest, but that he simply "does not maintain eye contact when conversing with others." The lawyer concluded, in a report prepared for the

Board, that "Billings' allegations of sexual harassment cannot be sustained."

Just before the report was submitted, Billings pressed her allegations by filing a charge of discrimination against Connor and the Town with both the Equal Employment Opportunity Commission and the Massachusetts Commission Against Discrimination ("MCAD"). About six months later, Connor appointed Hammond "Acting Town Administrator" for the purpose of investigating an incident where Billings had opened a letter to Connor from his attorney, marked "personal and confidential," that concerned the pending discrimination charge.[2] As part of her job, Billings opened all the mail coming into the Selectmen's Office, which often included correspondence from the Town's law firm marked "confidential." She explained that she had opened the letter in question without realizing it was from Connor's personal attorney (she says she did not even know that he had one) and that, when she realized its nature, she returned it to the envelope and put it in Connor's inbox.

Hammond's probe found that Billings, "[i]n light of [her] pending litigation" against Connor, "should have been more diligent in [her] efforts not to open any mail addressed to him, which may

_____

[2] Connor recused himself from the investigation.

have been sent by his counsel or concerned [her] litigation."[3] Concluding that Billings had been "negligent," Hammond wrote her a letter constituting "a verbal [*sic*] reprimand." The letter cautioned that "further infractions may result in further, more serious discipline." Connor later said that, in the absence of the discrimination charge, he would have handled the incident differently, testifying, "Had not my own secretary filed false allegations of sexual harassment against me, of course I would have gone and said, 'What happened here? Why did you open this up?'"

By the end of 2002, the MCAD had issued Billings a notice of her right to sue, and Billings had filed a complaint against Connor and the Town in U.S. District Court. Billings later informed the Board of Selectmen via letter "that the behavior of Mr. Connor leering at my chest has not ceased and has continued to date," alleging eleven separate examples of such conduct between January 3, 2003, and March 19, 2003. This time, the Board hired an outside attorney, Judith Loitherstein, to investigate the incidents referenced in Billings's most recent letter. Less than two weeks after learning of that letter, Connor provided Billings with two typed memoranda criticizing her failure to follow particular

---

[3] Hammond also found that, prior to the incident, the chairman of the Board of Selectmen had told Hazen "that all mail marked 'personal and confidential' that came into the . . . Office was to be opened by the addressee, only," and that Hazen had informed Billings of this "directive." Hazen later testified, however, that she had not received this instruction until after the incident.

instructions he had given her. Connor later told Loitherstein that he memorialized his criticism in this fashion because Billings had "ratcheted up the litigation" and had been "documenting anything that could be construed to help her case."

While interviewing Connor as part of her investigation, Loitherstein "noticed that his eyes frequently darted down and then back up again," but that she "did not get the impression that he was staring at [her] chest"--he looked in some other direction "just as frequently." This led Loitherstein to wonder "whether his eye movement is the result of a physical condition, a nervous condition, or some other reason" besides "sexual intent." After learning of these musings, Connor visited an ophthalmologist, who diagnosed him with "alternating intermittent exotropia"--"a condition in which one eye or the other will lose fixation and drift outward as one looks at him."

Loitherstein also asked Billings, as part of her interview, to demonstrate Connor's behavior by mimicking his eye motions while having a "conversation" with a drawing of a woman. Loitherstein observed that Billings "started out looking at the drawing's face," but that soon "her eyes would dart down at the chest area of the drawing for 2-3 seconds, and then look back up at the face," and that she repeated this "2-3 times" in a span of approximately 15 seconds. Based on Loitherstein's self-described "opinion" that this conduct did not amount to "a 'stare' or a

'leer,'" as well as her observations of Connor during his interview, she reported to the Board of Selectmen that "the allegations . . . that Mr. Connor 'leered' at Ms. Billings's chest on the 11 named dates are not supported." Loitherstein added, however, that she believed that Connor "did look in the direction of [Billings's] chest on those occasions." Loitherstein did not interview any of the other women who had previously said Connor had stared at their chests.

Connor suffered a heart attack in October 2003, necessitating a hospital stay and a prolonged absence from the office. During this period, Billings was charged with personal time for attending both her deposition and a court-ordered mediation session in her lawsuit against the Town and Connor. But a number of Town employees who also missed work for their depositions, including Connor, were not charged personal time; the Town later explained that they "were on official Town business when they were required by Ms. Billings' attorney to appear as deposition witnesses in this case. Their appearances were not related to a personal legal matter." Around this time, Billings, at her physician's recommendation, began regularly seeing a psychologist to help her cope with the anger she felt at Connor's behavior and the Town's response to it.

When Connor returned to work, he asked the Town to accommodate his heart condition by reducing his stress level. He

supported this request with a letter from his physician explaining that "there have been some stressful situations at work and I think in anyway that they could be avoided that would certainly be best for [his] health." Connor also presented a letter from Jeffrey Scherz, a psychologist who was treating him for "Acute Stress Disorder related to attempts by his secretary and others to discredit his reputation by filing charges of sexual harassment against him" when "three independent investigations conducted by the Town ha[d] revealed no evidence to show any basis for the charges." As a result, Scherz explained, "Mr. Connor has had to endure facing Mrs. Billings each day falsely accused." Observing that Billings's "continued hostility and harassment . . . has [*sic*] clearly taken its [*sic*] toll both physically and emotionally" on Connor, Scherz expressed his "clinical opinion that were Mr. Connor to return to his position as Town Administrator while Mrs. Billings is still employed by the Town as Secretary of the Town Administrator, it would likely result in significant jeopardy to his health and his need to cease his employment status."

Based on these letters, the Board of Selectmen decided to transfer Billings to a job as secretary in the Town's recreation department, effective December 22, 2003. The Town had offered the same position to Billings about a month earlier, but she had declined. In notifying her of the transfer, Hammond explained that Connor "ha[d] been on leave for a serious medical condition, which

may be related to stress," adding that Billings had "made charges against" him of which he "ha[d] been cleared by the investigators." Citing to Scherz's opinion, Hammond explained that, as "an accommodation to permit him to return to work," Connor "needs to have a different personal secretary in order to permit him to perform the essential functions of his Office."

There is conflicting evidence surrounding the decision to transfer Billings. One of the Selectmen attested that the Town had "considered various possible alternative responses" to Connor's request, but ultimately elected to move Billings because "equivalent positions existed into which [she] could be transferred" while Connor could not be given a different job because "there was no position equivalent to the Town Administrator's position." Yet Hammond testified that the Board did not discuss any alternatives to transferring Billings. Hammond also testified, inconsistently, both that he made the decision to transfer Billings as a "day-to-day operational" matter and that the Board made the decision and he simply carried it out.

There is also some disagreement over whether Billings's job as a secretary in the recreation department is in fact "equivalent" to her former position as secretary to the Town Administrator. Prior to the transfer, recreation secretary was a part-time, staff-level position accorded the lowest pay grade under the Town's classification system, while Billings previously

-11-

occupied a full-time, management-level position with a considerably higher pay grade. Billings nevertheless continued to work the same hours and receive the same wages, health insurance, and retirement benefits in her new job that she would have in her old one, and, in July 2005, the Board of Selectmen voted to "grandfather" Billings at her management-level classification and pay grade as of the transfer.

Because the Town has treated Billings's new job as a unionized position, however, the Board acted "subject to collective bargaining," leaving her classification open to future negotiations between the union and the Town.[4] In addition, shortly after the transfer, Connor directed that Billings start recording her hours by punching a time clock, like all of the Town's other union employees. Billings also began paying union dues of roughly eight dollars each week in early 2005. As secretary to the Town Administrator, Billings had been a non-union employee.

Billings also believes that her current job offers less in the way of prestige and responsibility than her previous one. She no longer reports directly to the Town Administrator, but to the recreation department coordinator, who in turn reports to the

---

[4] Though Billings received the same annual raises in 2004 and 2005 that she would have absent the transfer, reclassifying her as a staff- or clerical-level employee would effectively freeze her salary at its current level, because she already earns more than the maximum permitted for those classifications.

Administrator.  Moreover, according to a description of Billings's former job that Connor submitted to the Board of Selectmen in 2001, she needed to act as "a liaison between [the] public and town officials," to "[a]ssume administrative authority" in the case of Connor's absence, to "provide guidance" on his "operating policy" to the heads of the various local departments, and to research insurance, funding, and other issues that might confront the Town, in addition to performing a range of clerical duties.  The position also demanded at least three years of experience and skills commensurate with two years of a college education.  The official duties of recreation secretary, however, consist exclusively of clerical tasks, and its prerequisites are less stringent--a high school diploma and one year of relevant experience.  But the Town maintains that, official job descriptions aside, Billings actually spent her days as secretary to the Town Administrator "filing, typing and opening the mail," just as she now does for the recreation department.

Right after the transfer, Connor complained to Hammond that Billings was regularly coming into the Selectmen's Office to socialize with Hazen, send faxes, or go into the files, though Billings did not interact with Connor during these visits.  Hammond responded by telling the recreation coordinator that Billings could no longer enter the Selectmen's Office "for any reason" and that "it was up to [the coordinator] to keep [Billings] out."  Though

Hammond acknowledged that he did not know of any other Town employee who had ever been barred from the office, he explained that "[t]he accommodation made for Mr. Connor and the fact that there was still ongoing litigation" necessitated the ban. In accordance with the ban, Billings skipped a training session on using the Town's website because it took place in the Selectmen's Office, even though every other Town employee was there and her supervisor, the recreation coordinator, wanted her to attend.

After Connor retired as Town Administrator in February 2006, Billings promptly asked for her old job back, reminding the Town that it had transferred her "as an alleged accommodation for Mr. Connor." The Town refused on the ground that "the position is not vacant but is presently filled by a permanent employee," who had been hired in connection with Billings's move to the recreation department. Hammond later explained that, because both Billings and her replacement at the Town Administrator's office were "performing well," transferring them both would disserve the Town.

In the meantime, the Town and Connor moved for summary judgment on Billings's complaint, which included claims of a hostile work environment and retaliation in violation of Title VII and Chapter 151B against both defendants, and a common law claim of intentional infliction of emotional distress against Connor. Billings opposed the motion and cross-moved to amend her complaint to make additional allegations in support of her retaliation claim

and to name Hammond and certain present and former members of the Board of Selectmen as defendants to that claim.

The district court granted summary judgment for the Town and Connor on the hostile environment and intentional infliction of emotional distress claims, ruling that "the alleged harassing conduct here is insufficient as a matter of law to create an objectively hostile work environment because it is not sufficiently severe or pervasive." The court took the evidence, when viewed in the light most favorable to Billings, to show that "[o]ver the course of three years, Connor often stared at her breasts." Noting that Connor had not directed "sexual advances" or "overtly sexual comments" to Billings or "touched her inappropriately," the court reasoned that "Connor's conduct, though somewhat frequent, was not severe, physically threatening, or humiliating" (footnote omitted). Thus, while recognizing that it "may constitute 'sexual harassment' in the colloquial sense" when "a male supervisor . . . stare[s] repeatedly at a female subordinate's breasts," the district court ruled that "it does not, at least under the circumstances of this case, rise to the level of a 'hostile work environment' within the meaning of Title VII."

Treating Billings's motion to amend as a motion to supplement, see Fed. R. Civ. P. 15(d), the district court allowed her to augment her retaliation claim and, consequently, deferred ruling on the defendants' motion for summary judgment on that claim

pending the completion of further discovery.  In due course, the defendants renewed their summary judgment motion, arguing that Billings could show neither an adverse employment action nor the link between any such action and her protected activity necessary to prevail on her retaliation theory.

The district court accepted both of these contentions. First, it concluded that neither transferring Billings to the recreation department nor refusing to move her back to the Town Administrator's office constituted retaliation because the transfer "was not in substance a demotion and did not otherwise involve material changes in her work environment."  441 F. Supp. 2d 227, 244 (D. Mass. 2006).  Second, the court ruled that Billings had failed to rebut the defendants' proffered "non-retaliatory" justification for the transfer as "an accommodation to the health-related concern raised by Connor's physicians."  Id. at 242. Though the district court acknowledged that Billings's complaints of harassment had in fact precipitated the transfer, by leading Connor to ask for the accommodation in the first place, the court reasoned that this theory of "but-for causation," while sufficient to make out a prima facie case of retaliation, could not withstand summary judgment.  Id.

Finally, the district court ruled that the other alleged instances of retaliation--Connor's reaction to Billings's question at the Board of Selectmen meeting, the investigation of her opening

-16-

the letter from his lawyer, his decision to memorialize his dissatisfaction with certain aspects of her performance, the perceived change in his behavior around the office since he learned that Billings was his accuser, charging her personal time to attend her deposition, and banning her from the Selectmen's Office--did not amount to adverse employment actions and, even if they did, "in each instance there is uncontroverted evidence of a non-retaliatory reason and an absence of evidence as to pretext." Id. at 244. The district court therefore granted summary judgment for the defendants on the retaliation claim in its entirety.

## II.

Billings challenges the entry of summary judgment against her on her claims of a hostile work environment and retaliation.[5] Summary judgment can be granted only "if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Billings argues that, in light of the evidence surrounding her treatment by Connor and the other defendants, the district court could not have ruled as a matter of law that she experienced neither sexual harassment nor retaliation in violation of Title VII and Chapter 151B. We consider her claims in turn.

---

[5] Because Billings has not appealed the entry of summary judgment on her intentional infliction of emotional distress claim, that claim is waived. See, e.g., Stanton v. Metro Corp., 438 F.3d 119, 124 (1st Cir. 2006).

-17-

**A.**

Title VII's ban on employment practices that "discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), extends to sex-based discrimination that creates a hostile or abusive work environment.[6] Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986); Forrest v. Brinker Int'l Payroll Co., ___ F.3d ___, 2007 WL 4415497, at *2 (1st Cir. Dec. 19, 2007). This sort of discrimination is generally referred to as "sexual harassment," but "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII . . . ; [f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment'." Meritor, 477 U.S. at 67 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)); see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

---

[6] Chapter 151B, Title VII's Massachusetts counterpart, contains a like prohibition, see, e.g., Coll.-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 508 N.E.2d 587, 590 & n.3 (Mass. 1987), and neither side has pointed out any differences between state and federal sexual harassment law that might bear on the outcome here. Accordingly, we do not separately discuss the Chapter 151 claim, the fate of which rests on the fate of the Title VII claim for the purposes of this appeal.

To give rise to a sexual harassment claim, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). The district court ruled that, though Billings "subjectively experienced" Connor's staring as abusive, it nevertheless did not create a hostile environment in the objective sense--in essence, that a reasonable person in Billings's position would disagree with her subjective assessment. We do not think that the summary judgment record permits that conclusion as a matter of law.[7]

The point at which a work environment becomes hostile or abusive does not depend on any "mathematically precise test." Harris, 510 U.S. at 22. Instead, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting Harris, 510 U.S. at 23). These

_____

[7] The defendants argue that "whether the plaintiff was subjected to an objectively hostile work environment is not a question of fact for the jury; it is a question of law for the Court to determine based on the undisputed facts." That is incorrect. The existence of a hostile environment is determined by the finder of fact, see, e.g., O'Rourke v. City of Providence, 235 F.3d 713, 728-29 (1st Cir. 2001) (citing Meritor, 477 U.S. at 69), though, as we discuss infra, that does not prevent a court from ruling that a particular set of facts cannot establish a hostile environment as a matter of law in an appropriate case.

-19-

circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," but are by no means limited to them, and "no single factor is required." Harris, 510 U.S. at 23; see also, e.g., Conto v. Concord Hosp., Inc., 265 F.3d 79, 81 (1st Cir. 2001) (noting that a hostile environment claim "necessarily entail[s] a fact-specific assessment of all the attendant circumstances").

While the district court properly articulated this standard, we think it applied the standard in too rigid a manner. In particular, we think the court's analysis placed undue weight on the fact--undisputed though it was--that Connor's alleged behavior did not include touching, sexual advances, or "overtly sexual comments to or about her." As we have just explained, the hostility vel non of a workplace does not depend on any particular kind of conduct; indeed, "[a] worker need not be propositioned, touched offensively, or harassed by sexual innuendo in order to have been sexually harassed." Quick v. Donaldson Co., 90 F.3d 1372, 1379 (8th Cir. 1996) (internal quotation marks omitted); see also Smith v. First Union Nat'l Bank, 202 F.3d 234, 242 (4th Cir. 2000) (reversing summary judgment for defendant on hostile environment claim, despite absence of touching, propositioning, or

ogling, because "a woman's work environment can be hostile even if she is not subjected to sexual advances or propositions").

Of course, behavior like fondling, come-ons, and lewd remarks is often the stuff of hostile environment claims, including several previously upheld by this Court.  See, e.g., Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19-20 (1st Cir. 2002) ("sexual remarks and innuendos," including "a sexual invitation," as well as "unwelcome physical touching"); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 397-98 (1st Cir. 2002) (unwanted touching, complimenting, and following around, culminating in the harasser's breaking into the plaintiff's home and accosting her); Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 55-56 (1st Cir. 2000) (repeated requests for dates and use of suggestive language); White v. N.H. Dep't of Corr., 221 F.3d 254, 260-61 (1st Cir. 2000) (commonplace "sexual conversations and jokes," including at the plaintiff's expense, coupled with disparate treatment).  In ruling that Billings could not succeed on such a claim as a matter of law, the district court relied on these cases, reasoning that "the record is devoid of the types of behavior that marked the presence of a hostile work environment" in those cases.  But, as we have said, no particular "types of behavior" are essential to a hostile environment claim.

Each of these cases simply held that, based on the evidence presented, a reasonable jury could have found the

-21-

harassment sufficiently severe or pervasive to constitute a hostile environment as a matter of law. Marrero, 304 F.3d at 20; Crowley, 303 F.3d at 400-01; Hernandez-Loring, 233 F.3d at 56; White, 221 F.3d at 261.[8] Thus, while they serve as instructive examples of actionable sexual harassment, they do not suggest that harassing conduct of a different kind or lesser degree will necessarily fall short of that standard. Cf. Harris, 510 U.S. at 22 (explaining that "especially egregious examples of harassment" discussed in Meritor "do not mark the boundary of what is actionable"). As another court has cautioned about the use of its own precedent in this area, "[p]rior cases in which we have concluded that a reasonable juror could find that the work environment was objectively hostile do not establish a baseline that subsequent plaintiffs must reach in order to prevail." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 606 (2d Cir. 2006) (internal quotation marks omitted).

The highly fact-specific nature of a hostile environment claim tends to make it difficult to draw meaningful contrasts between one case and another for purposes of distinguishing between

---

[8] The district court also relied on O'Rourke, a case in which we did not consider whether the plaintiff had adequately proven her hostile environment claim, but rather when the nature of the allegedly hostile acts sufficed to put her on notice of the claim for statute of limitations purposes, and whether the evidence of her damages supported the jury's monetary award. 235 F.3d at 731-34. O'Rourke therefore does not provide an apt model for the resolution of Billings's hostile environment claim.

-22-

sufficiently and insufficiently abusive behavior. Conduct that amounts to sexual harassment under one set of circumstances may, in a different context, equate with the sort of "'merely offensive'" behavior that lies beyond the purview of Title VII, and vice versa. See Marrero, 304 F.3d at 18-19 (quoting Harris, 510 U.S. at 21). Again, we agree with the Second Circuit that "the fact that . . . actions did not constitute a hostile work environment in [one] case, when considered as part of all the circumstances there, does not establish a rule that similar actions in another context would not, as a matter of law, amount to one." Schiano, 445 F.3d at 607.

By like token, we disagree with the district court's reasoning that Connor's alleged behavior did not constitute sexual harassment as a matter of law because it was "similar in terms of degree" to the conduct we considered in Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34 (1st Cir. 2003), where we upheld summary judgment for the employer because the employee failed to prove she was subjected to a hostile work environment that was severe or pervasive. In Lee-Crespo, the plaintiff's supervisor "bothered [her] with meddlesome and prying questions about her personal life and made comments about her appearance and behavior," id. at 38, manifesting "a disregard for professional courtesy and a penchant for inquiring about the personal affairs of other workers (both male and female)." Id. at 46. We held that this conduct--which we characterized as "a supervisor's

-23-

unprofessional managerial approach and accompanying efforts to assert her authority"--was simply "not the focus of the discrimination laws." Id. at 47.

Connor's complained-of behavior, however, does not lend itself to the same characterization. As the district court recognized, "for a male supervisor to stare repeatedly at a female subordinate's breasts . . . is inappropriate and offensive," not merely "unprofessional." Thus Connor's alleged staring is fundamentally different from the intrusive questions and comments at issue in Lee-Crespo. Furthermore, to the extent that actions so different in kind lend themselves to any comparison "in terms of degree," we believe that the degree of harassment allegedly experienced by Billings in this case exceeds that allegedly experienced by the plaintiff in Lee-Crespo. There, applying the Harris factors, we reasoned that "the complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never . . . an impediment to [the plaintiff's] work performance." 354 F.3d at 46. We cannot make the same determinations about Connor's behavior here, particularly where the record permits competing conclusions about the frequency and intensity of Connor's alleged conduct.

Billings, for example, describes her interactions with Connor as "stares" about five seconds long, while Loitherstein concluded, based on her interviews with both Billings and Connor, that his eyes simply "darted" downward (as well as in other directions) for no more than two or three seconds at a time. As the district court noted, "[t]he evidence regarding the frequency of Connor's alleged staring is somewhat incomplete," but Billings testified "that '[i]t happened a lot.'".[9] When we resolve these and the other factual disputes in the record in favor of Billings, we cannot definitively say, as the district court did, that Connor's conduct was not sufficiently severe or pervasive to allow a jury to find in favor of Billings on her hostile environment claim. As we have observed, the hostile environment "question is commonly one of degree--both as to severity and pervasiveness--to be resolved by the trier of fact on the basis of inferences drawn 'from a broad array of circumstantial and often conflicting evidence.'" Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 474 (1st Cir. 2002) (quoting Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1998)). We see this case as no exception.

We do not mean, of course, that hostile environment cases inevitably raise issues that cannot be resolved by summary

_____

[9] Billings reported that the frequency of the staring decreased after her initial complaint was reported to the Board of Selectmen in early 2001, from a number of times each day to "a couple of times a week." A few weeks later, she reported, the staring returned to its former frequency.

judgment, which remains "an appropriate vehicle for policing the baseline for hostile environment claims." Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (internal quotation marks and bracketing omitted). And we accept, as a general proposition, that not every such claim premised on staring or leering in the workplace automatically presents a question for the jury. We hold simply that the record in this case does not permit the ruling, as a matter of law, that the circumstances of Billings's employment did not add up to a hostile environment.

Taken in the light most favorable to Billings, the evidence depicts a supervisor who regularly stared at her breasts for much of the two and a half years they worked together. Thus, the alleged harassment did not consist merely of the sort of "isolated incidents" that ordinarily "will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788 (internal quotation marks omitted).[10]

---

[10] Relying on Faragher's point that, like "isolated incidents," "simple teasing" and "offhand comments" usually will not amount to actionable sexual harassment, 524 U.S. at 788, the defendants downplay Connor's remark to another employee that Billings was "under the desk." While we have little doubt that, taken in isolation, the remark does not suffice to establish a hostile environment, see, e.g., Pomales, 447 F.3d at 83-84, it did not occur in isolation, but in the context of Connor's allegedly staring at Billings's chest, and must be assessed as such. See O'Rourke, 235 F.3d at 730 ("Courts should avoid disaggregating a hostile work environment claim"). Ultimately, the significance of Connor's remark to Billings's larger hostile environment claim is a question for the finder of fact.

Other women who worked for the Town also said Connor had subjected them to similar behavior, which they, too, found objectionable. See Hernandez-Loring, 233 F.3d at 55 n.4 ("Evidence of the harassment of third parties can help to prove a legally cognizable claim of a hostile environment."). Furthermore, Billings did not stand silent in the face of her alleged treatment, but repeatedly complained to both Hazen and the Board of Selectmen. See id. at 55-56 (citing fact "that on various occasions [the plaintiff] had complained about [the harasser's] conduct" in reversing dismissal of hostile environment claim).

Based on these and other aspects of Billings's response to Connor's alleged staring, we disagree with the defendants that no reasonable jury could conclude that the staring unreasonably interfered with her work performance or altered the terms and conditions of her employment as a matter of law. As the defendants emphasize, Billings did testify that she was able to continue performing her duties notwithstanding the complained-of behavior: as she put it, "I mean, I could sit and type a letter, yes." She added, however, that "every time I needed to talk to him, I had to make sure I was carrying something in front of me so that he wouldn't look at me. I just had to be careful with what I wore in the morning, be careful with what I said." The fact that Billings managed to get her work done despite these measures is by no means fatal to her hostile environment claim. See Dey v. Colt Constr. &

<u>Dev. Co.</u>, 28 F.3d 1446, 1454 (7th Cir. 1994) ("[T]he mention in <u>Harris</u> of an unreasonable interference with work performance was not intended to penalize the employee who possesses the dedication and fortitude to complete her assigned tasks even in the face of offensive and abusive sexual [harassment] from one of her superiors.").

The defendants also maintain that, whatever the effect of Connor's behavior on Billings in the subjective sense or on her workplace in the objective sense, it did not amount to "sexual harassment" under Title VII because it was not "of a sexual nature." We cannot reasonably accept, however, that a man's repeated staring at a woman's breasts is to be ordinarily understood as anything other than sexual. In arguing to the contrary in this case, the defendants rely on Connor's eye condition, coupled with the fact that others who worked with him "did not sense any sexual intent underlying" his "failure to maintain eye contact." While this might have some bearing on whether Connor's staring created an objectively hostile work environment, it does not mean that the staring cannot support such a claim as a matter of law, because "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." <u>Oncale</u>, 523 U.S. at 80. In any event, the defendants' innocent explanation for Connor's behavior is certainly not the only reasonable view of the

evidence.[11]  Because that evidence, in its entirety, does not foreclose a finding that Billings experienced a hostile work environment, the district court should not have entered summary judgment against her on that claim.

**B.**

The district court also granted summary judgment for the defendants on Billings's retaliation claim.  Title VII, in relevant part, makes it illegal "for an employer to discriminate against any of his employees . . . because he has opposed any practice made unlawful . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under that law.[12]  42 U.S.C. § 2000e-3(a).  As recently explicated by the Supreme Court, this "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington N. & Santa Fe Ry. v. White, 126 S. Ct. 2405, 2414 (2006) ("Burlington Northern").  Instead, to prevail on a claim of retaliation in

---

[11]Billings points out, for example, that Connor's diagnosed eye condition is characterized by one eye or the other drifting outward, not both eyes drifting downward, as she has described.

[12]Massachusetts law contains a similar prohibition, Mass. Gen. Laws ch. 151B, § 4(4A), and, as with the hostile environment claim, neither side argues that the standards of liability for a retaliation claim under federal and state law differ in any respect material to the outcome here.  Accordingly, we do not separately consider the state-law retaliation claim which, like the state-law hostile environment claim, rises or falls on the federal claim for purposes of this appeal.

violation of Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (internal quotation marks omitted). Accord Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007).

Reciting the Burlington Northern test, the district court ruled that Billings had not suffered a "materially adverse" employment action, either in the form of her transfer or any of the defendants' other alleged attempts at retaliation. We have not previously reviewed a district court's application of the Burlington Northern standard. Doing so for the first time here, we disagree with the district court's conclusion that, under Burlington Northern, Billings cannot succeed on her retaliation claim as a matter of law.

The plaintiff in Burlington Northern worked as a track laborer for a railroad, but, because she had been assigned to operate a forklift soon after her hiring, had a "less arduous and cleaner job" than other employees of the same rank. 126 S. Ct. at 2409. After complaining about some sexist remarks by her supervisor, however, the plaintiff was reassigned to standard track laborer tasks. Id. When she claimed that this had been done in retaliation for her previous complaint, the plaintiff was suspended

without pay--though she ultimately received those wages when the railroad reversed the suspension 37 days later. Id. The plaintiff then brought an employment discrimination claim, alleging that both the reassignment and the suspension amounted to retaliation under Title VII. Id. at 2410. A jury agreed, and both the district court and the court of appeals upheld the verdict. Id.

In line with the prevailing law in certain of the courts of appeals at the time, the railroad argued that the challenged actions could not constitute retaliation because they had not "affect[ed] the employee's compensation, terms, conditions, or privileges of employment"--what those courts referred to as "ultimate employment decisions." Id. at 2410-11 (internal quotation marks and bracketing omitted). The Supreme Court rejected this view, holding that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 2414. As we have noted, however, the Court also held that "the provision covers those (and only those) actions that would have been materially adverse to a reasonable employee . . . . [T]he employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of job discrimination." Id. at 2409.

The Court went on to conclude that, viewed against this standard, the evidence of the railroad's actions adequately

supported the jury's findings of retaliation.  Id. at 2416.  The Court disagreed with the railroad that it could not have retaliated by reassigning the plaintiff because "the former and present duties fall within the same job description," reasoning that "[c]ommon sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."  Id.  The Court cautioned, however, that "reassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances'.'"  Id. at 2417 (quoting Oncale, 523 U.S. at 81 (quoting Harris, 510 U.S. at 23)).

Noting "considerable evidence that the track laborer duties were by all accounts more arduous and dirtier; that the forklift operator position required more qualifications, which is an indication of prestige; and that the forklift operator position was objectively considered a better job and the male employees resented [the plaintiff] for occupying it," the Court ruled that a jury could have reasonably found the reassignment "materially adverse to a reasonable employee."  Id.  (internal quotation marks omitted).  The Court also ruled that the jury could have reasonably

found that the plaintiff's suspension was materially adverse, despite her reinstatement with back pay 37 days later. Id. In support of this conclusion, the Court observed that "[m]any employees would find a month without a paycheck to be a serious hardship" and cited the plaintiff's testimony that she, in fact, did. Id. Thus, the Court reasoned, "an indefinite suspension without pay could well act as a deterrent" to filing an employment discrimination claim, "even if the suspended employee eventually received back pay." Id. at 2417.

We cannot reconcile the Court's decision in Burlington Northern with a determination that Billings's transfer did not constitute a materially adverse employment action as a matter of law. The district court observed that, under Burlington Northern, "[a]n objectively reasonable loss of prestige is one factor suggesting that a change of duties may constitute a materially adverse action," but reasoned that, in the case of the move to the recreation department, "the difference in prestige is objectively slight, and Billings's complaints arise largely out of her own subjective feelings of disappointment." 441 F. Supp. 2d at 240. It is true that an employee's displeasure at a personnel action cannot, standing alone, render it materially adverse. See, e.g., Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996). In our view, though, Billings also came forward with enough objective evidence

contrasting her former and current jobs to allow the jury to find a materially adverse employment action.

A jury could find that, as a result of the transfer, Billings occupied an objectively less prestigious job, reporting to a lower ranked supervisor, enjoying much less contact with the Board, the Town, and members of the public, and requiring less experience and fewer qualifications. See Burlington Northern, 126 S. Ct. at 2417. Unlike the district court, we see these facts as evidence of reduced prestige in the objective sense, not merely in Billings's subjective opinion. Cf. Alvarado v. Tex. Rangers, 492 F.3d 605, 613 n.7 (5th Cir. 2007) (drawing distinction between "loss of subjective prestige," which cannot itself show an adverse employment action, and "loss of objective prestige," which can) (internal quotation marks omitted). In addition to these consequences, a jury could also find that the recreation department position likely requires Billings to pay union dues and subjects her to union-associated mechanisms like grievance procedures, collective bargaining (which threatens to cap her earning capacity), and punching a time card. Under these circumstances, we cannot say, as a matter of law, that the transfer to the recreation department could not "well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 126 S. Ct. at 2409.

The district court also ruled that, aside from the transfer to the recreation department and the Board of Selectmen's subsequent refusal to give Billings her old job back after Connor retired, the other actions she cited in support of her retaliation claim were also not materially adverse. We agree that some of Connor's behavior--upbraiding Billings for her question at the Board of Selectmen meeting, criticizing her by written memoranda, and allegedly becoming aloof toward her--amounts to the kind of "petty slights or minor annoyances that often take place at work and that all employees experience" and that, consequently, fall outside the scope of the anti-discrimination laws.[13] Burlington Northern, 126 S. Ct. at 2415; see also Marrero, 304 F.3d at 25 (ruling that supervisors' "extreme supervision" and "snubb[ing]" of plaintiff was not adverse) (internal quotation marks omitted); Hernandez-Torres v. Intercont. Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998) (ruling that increased criticism was not adverse).

---

[13] Of course, retaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment. See Noviello v. City of Boston, 398 F.3d 76, 88-90 (1st Cir. 2005). Because Billings has not presented an argument about the collective effect, however, we have considered the alleged acts of retaliation independently, and found that some of them, when taken on that basis, are not materially adverse as a matter of law. We do not mean to suggest, by way of this conclusion, that evidence of those acts would not be admissible in support of Billings's remaining retaliation or hostile environment claims; we leave that determination for the district court in the first instance.

But we cannot say the same for the other incidents, namely, investigating and reprimanding Billings for opening the letter from Connor's attorney, charging her with personal time for attending her deposition in this case, and barring her from the Selectmen's Office. While these measures might not have made a dramatic impact on Billings's job, conduct need not relate to the terms or conditions of employment to give rise to a retaliation claim. Burlington Northern, 126 S. Ct. at 2416. Indeed, we think that these actions, by their nature, "could well dissuade a reasonable [employee] from making or supporting a charge of discrimination." Id. at 2409. An employee who knows that, by doing so, she risks a formal investigation and reprimand--including a threat of "further, more serious discipline"--for being insufficiently careful "[i]n light of [her] pending litigation," as well as the prospect of having to take personal time to respond to a notice of deposition issued by her employer in that litigation, might well choose not to proceed with the litigation in the first place.[14] See id. at 2417-18.

Similarly, the ban from the Selectmen's Office might, under some circumstances, seem "a nonactionable petty slight," id.

[14] We do not mean to suggest any general rule that an employer must give an employee paid time off to deal with the incidents of her discrimination suit against the company. We hold more narrowly that, in the circumstances of this case, a jury could supportably find that the contrary decision was an adverse employment action.

at 2415, but here, it prevented Billings from attending an important instructional session attended by all of her colleagues. Like "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement," then, keeping Billings out of the Selectmen's Office, in context, "might well deter a reasonable worker from complaining about discrimination." Id. at 2415-16. Again, though we acknowledge that a jury could reasonably reach the opposite conclusion, we cannot do so as a matter of law.

Finally, the district court ruled that, even if the complained-of actions could be considered materially adverse, Billings had failed to show the requisite causal connection between them and her protected activity, i.e., the lodging of her internal complaints, charge of discrimination, and eventually this lawsuit, over Connor's alleged harassment. Applying the McDonnell Douglas burden-shifting approach, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), the district court concluded that, while Billings had made out a prima facie case of retaliation, she had not come forward with any evidence rebutting the defendants' legitimate, non-discriminatory justifications for their actions. The district court ruled that, in particular, Billings had not shown that the defendants' stated reason for transferring her--to accommodate Connor's medical condition--amounted to pretext.

Under the McDonnell Douglas approach, an employee who carries her burden of coming forward with evidence establishing a prima facie case of retaliation creates a presumption of discrimination, shifting the burden to the employer to articulate a legitimate, non-discriminatory reason for the challenged actions. See, e.g., Mariani-Colón v. Dep't of Homeland Sec., __ F.3d ___, 2007 WL 4403526, at *5 (1st Cir. Dec. 18, 2007); Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 336 (1st Cir. 2005). "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for [the challenged actions] was in fact a pretext for retaliating . . . ." Colburn, 429 F.3d at 336 (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 161 (1st Cir. 1998) (internal quotation marks omitted).

Just as there is no mechanical formula for identifying a hostile work environment, "there is no 'mechanical formula' for finding pretext." Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003) (quoting Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 6 (1st Cir. 2000)). One way to show pretext is through "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and

[with or without the additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons." Hodgens, 144 F.3d at 168 (alteration in original) (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotation marks omitted). The record has sufficient evidence to preclude the judgment, as a matter of law, that the defendants transferred Billings as an accommodation for Connor's heart condition rather than as retaliation for her complaints of sexual harassment.

First, as we have noted, the defendants have provided conflicting accounts about who made the decision to transfer Billings and, more importantly, how it was made. An employer's "different and arguably inconsistent explanations" for its challenged employment action can serve as evidence of pretext. Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000). Second, in one of these accounts, the Board of Selectmen did not consider any response to Connor's request for an accommodation other than moving Billings to the recreation department--which was offered to her on a voluntary basis before Connor had made the request. This chronology casts some doubt on whether the accommodation was the real reason for the transfer. Cf. McDonough v. City of Quincy, 452 F.3d 8, 18 (1st Cir. 2006) (finding sufficient evidence that claimed restructuring was pretext for retaliatory transfer where, inter alia, restructuring had not

-39-

been previously discussed).  Third, in explaining the transfer to Billings, Hammond asserted that the Town's investigations had "cleared" Connor of the harassment allegations when, in fact, Loitherstein had concluded that Connor looked at Billings's chest during the eleven incidents at issue, but that, in Loitherstein's opinion, Connor had not "leered" or "stared."  Indeed, a jury could find, based on Billings's complaints and the corroborating accounts from other women, that Connor had not in fact been "cleared."  On those facts, a jury could conclude that the investigations were inadequate or had predestined outcomes.

We do not rule out the possibility that a jury, properly focused on the defendants' perception, could reasonably find that they thought Connor's medical condition necessitated the transfer, and that, consequently, this explanation was not a pretext for retaliation.  Cf. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006), cert. denied, 127 S. Ct. 1831 (2007).  But we think that, under the circumstances of this case, it is the jury that must make this decision, one way or the other.  As we have advised, "where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment."  Hodgens, 144 F.3d at 167 (quoting Stepanischen v. Merch. Despatch Transp. Corp., 722 F.2d

922, 928 (1st Cir. 1983)). Such caution is appropriate here, given the factual disputes swirling around the transfer decision.

Finally, we disagree with the district court's ruling that there was no discriminatory intent behind the remaining actions that Billings describes as retaliatory, i.e., the letter-opening contretemps, the ban from the Selectmen's Office, the charging of personal time for her deposition, and the refusal to reassign her to her old job after Connor retired. Connor admitted that he would not have called for a formal investigation into the handling of the letter had Billings not accused him of sexual harassment, and Hammond reprimanded her for her lack of care "[i]n light of [her] pending litigation." See, e.g., Hodgens, 144 F.3d at 168-69 (endorsing consideration of decisionmaker's statements in deciding retaliatory motive). Hammond offered a similar explanation for barring Billings from the Selectmen's Office-- citing "the fact that there was still ongoing litigation"--and also acknowledged that, so far as he was aware, no other Town employee had ever been barred from the Selectmen's Office. See, e.g., Azzaro v. County of Allegheny, 110 F.3d 968, 974 (3d Cir. 1997) (finding that handling of termination supported inference of retaliatory motive where "no one else in the recent history of the [employer]" had been terminated that way). Relatedly, though Billings had to take a personal day to attend her deposition in this case, other employees did not, and the selectmen refused to

retransfer Billings to her former position after Connor's departure, even though his stress at working with her was the purported reason for her transfer out of that job. While the defendants have attempted to justify these decisions on a non-retaliatory basis, we cannot say, as a matter of law, that these justifications carry the day. There is sufficient evidence to permit the conclusion that they were pretextual.

### III.

For the foregoing reasons, we **vacate** the district court's entry of summary judgment for the defendants on Billings's hostile environment claims, and **remand** them for further consideration consistent with this opinion. We also **vacate** summary judgment for the defendants on Billings's retaliation claims and **remand** them insofar as they arise out of the transfer, the investigation and reprimand over the letter-opening, the charging of personal time to attend her deposition, the ban from the Selectmen's Office, and the refusal to reassign her. We otherwise **affirm** the district court's decision on the retaliation claims. Costs are awarded to Appellant Nancy M. Billings.

**So ordered.**