# United States Court of Appeals
## For the First Circuit

No. 20-1495

MARGARET BENSON,

Appellant-Plaintiff,

v.

WAL-MART STORES EAST, L.P.,

Appellee-Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson, Circuit Judge,
and Gelpí,* District Judge.

Guy D. Loranger for appellant.
Katherine I. Rand, with whom Daniel R. Strader and Pierce Atwood LLP were on brief, for appellee.

September 15, 2021

---

* Of the District of Puerto Rico, sitting by designation.

**GELPÍ, District Judge.** This case, in federal court on the basis of diversity of citizenship, 28 U.S.C. § 1332(a)(1)(c), involves ambiguous job requirements, unclear expectations, and continuous miscommunications between appellant Margaret Benson ("Benson") and appellee Wal-Mart Stores East, L.P. ("Wal-Mart"). Based on our review of the district court record, we conclude the disputed factual evidence as adduced and the fair inferences therefrom reasonably support a case for disability discrimination under the Maine Human Rights Act and for retaliation under the Maine Whistleblower Protection Act and the Maine Human Rights Act. Therefore, for the reasons explained below, we reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

## I. Standard of Review

We review the district court's grant of summary judgment in favor of Wal-Mart *de novo*. United States ex rel. Jones v. Brigham & Women's Hosp., 678 F.3d 72, 83 (1st Cir. 2012). Summary judgment is proper if Wal-Mart can demonstrate that "there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage of the proceedings, we construe the record and all reasonable inferences from it in favor of the party opposing the summary judgment motion, Benson. Martínez v. Novo Nordisk Inc., 992 F.3d 12, 16 (1st Cir. 2021) (citing Rodríguez-Cardi v. MMM Holdings,

Inc., 936 F.3d 40, 46 (1st Cir. 2019)).  Notwithstanding, "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  Brandt v. Fitzpatrick, 957 F.3d 67, 75 (1st Cir. 2020) (quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 116–17 (1st Cir. 2015)).

We present below all undisputed facts, relying both on the district court's opinion and order as well as the parties' proposed statements of uncontested facts that are properly supported by evidence on the record.  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000) (noting that under Rule 56, "the court should review the record as a whole").  Any genuinely disputed material fact shall also be detailed therein, where it is relevant to either party's argument.

## II.  Background

Benson's story is complicated, involving multiple lawsuits, countless medical appointments, and a series of Wal-Mart administrators.  In order to provide the reader all relevant information in a comprehensible manner, we begin with an overview of the events that led to this case and then turn to a more detailed description of the testimony, as needed.

## A. Overview

In February 2013, Benson began her employment at the Wal-Mart store in Windham, Maine, as a cashier. In October 2014, Benson—at the time a grocery reclamation associate—suffered a piriformis injury while at work.[1] The injury prevented her from working and she took a leave of absence. Initially, Wal-Mart refused to acknowledge her injury was "work-related," but eventually agreed that it was and offered Benson a Temporary Alternative Duty (TAD) position that she accepted. Benson worked, apparently without incident from June 2015 when she returned, until April 2016 when she took another leave of absence to cope with the side effects of treatment for her injury.

Around the same time, in March 2016, Benson, through counsel, filed an action against Wal-Mart in the United States District Court claiming discrimination for failure to accommodate related to this workplace injury. Benson v. Wal-Mart Stores E., L.P., No. 16-cv-114 (DBH), 2017 WL 2729491 (D. Me. June 23, 2017) ("Benson I"). Ultimately, the district court in that case entered summary judgment for Wal-Mart. The legal analysis in that case has no bearing upon the case before us, but, as we will discuss

---

[1] The piriformis is a "muscle that arises from the front of the sacrum, passes out of the pelvis through the greater sciatic foramen, is inserted into the upper border of the greater trochanter of the femur, and rotates the thigh laterally." Merriam-Webster's Medical Desk Dictionary 640 (2005).

later, Benson cites Benson I as motivation for Wal-Mart's alleged retaliation.

On October 14, 2016, with her first lawsuit still pending, Benson returned to work in another TAD position, as a People Greeter. Generally, People Greeters would welcome customers when they arrived at the store, provide front-end security, ensure customer safety in the greeting area, respond to electronic surveillances alarms, and provide customers with directions. On the days when Benson was scheduled to work, her assigned shift time was from 6:00 a.m. to 2:00 p.m. It was the practice of the store to have at least one People Greeter scheduled each day for each entrance while the store was open. If a People Greeter was absent, Wal-Mart tended to not replace them, so those functions went unfilled.

Upon Benson's return to work, two things happened that are important to her current claims. First, Benson informed management at the Windham store that she would continue to have regularly scheduled medical appointments for her work-related injury. In response, Nancy Little, a Wal-Mart store supervisor, assured her that "as long as [she] gave her notice [to the store's Personnel Coordinator] of when the time frame was, that they would take care of it and make [her] schedule fit accordingly." Second, Benson also learned of Wal-Mart's Attendance/Punctuality Policy-Maine ("Attendance Policy"), which had changed since Benson

- 5 -

took a leave of absence earlier in the year.[2]  With those facts in mind, we turn to the details of Wal-Mart's Policy and Benson's efforts to comply with them while attending to her health needs.

### B.    Wal-Mart's Attendance Policy

The Attendance Policy, effective October 2016 and applicable to Benson's claims, provides that it is understandable that employees "may have to miss work on occasion.  However, regular and punctual attendance is a required and essential function of each associate's job."  The Attendance Policy expressly states that "excessive absences or incomplete shifts" may result in termination.  It further points out that "[w]hen possible, [an employee] should schedule time off in advance to avoid negatively affecting other associates, customers, and the company."

The Policy additionally states that "[a]n unauthorized absence may result from arriving late or leaving early, as well as missing entire scheduled shifts."[3]   The Attendance Policy

---

[2] The record is murky on how Wal-Mart informed employees of the Attendance Policy, but, at her deposition, Benson discussed her impressions and understanding of the policy and appears to have acknowledged that she understood it was in place when she returned to work.  Also, Benson does not dispute that she knew the Attendance Policy was in effect in October 2016.

Separately, all agree that the Attendance Policy was amended from the policy under which Benson had previously worked.  The record does not contain great detail about the previous policy and the parties do not argue that the fact of a change is relevant to Benson's case here.

[3] The Attendance Policy assigns: 1 "occurrence" for a full-day

specifically defines "unauthorized absences" as "any time [an employee is] away from a scheduled shift for a reason that is not [a]uthorized or approved by [a] supervisor or manager, unless [the employee] use[s] an income replacement benefit (such as PTO [or Paid Time Off], Sick Time or Personal Time)." Too many unauthorized absences could result in an employee being fired.

On the other hand, the Attendance Policy also provides a list of absences that are considered "authorized," and, therefore, per the Policy, need not be "approved by [a] supervisor or manager."[4] Among those were "[w]orkers' compensation" absences. The "Responsibility to Notify Management" section of the Attendance Policy specifies that an employee "must make every effort to report absences or late arrivals (tardies) at least one hour prior to [the] scheduled start time, unless it would be unreasonable to expect [the employee] to report the absences due

---

absence; .5 of an "occurrence" for a late arrival and early departures of between 10 and 120 minutes, and 1 occurrence for a late arrival or early departure of more than 120 minutes. Each "unauthorized" absence or instance of tardiness therefore results in a partial "occurrence" or one or more "occurrences." If an associate accumulates nine or more "occurrences" in a rolling six-month period, through any combination, the employee "will be subject to termination."

[4] It is unclear from the text of the Attendance Policy whether those absences needed to be approved prior to their occurrence. As we will discuss, Benson and some Wal-Mart employees have different opinions as to whether the Policy requires *pre*-approval or mere eventual approval.

to circumstances outside of [the employee's] control." To notify management of an absence or late arrival, an employee must report by either calling a designated 1-800 number or using the "Wal-Mart One" website.[5] Benson understood, as she had discussed with Wal-Mart's management, that she could *either* provide verbal notice or make store management aware—via a written note—of her workers' compensation related absences. The term "workers' compensation," which is central to Benson's case, is not defined in the Attendance Policy.[6]

The Windham store manager, Susan Bradstreet ("Bradstreet" or "Manager Bradstreet"), interpreted "workers' compensation" to refer to "leaves of absence" authorized by Wal-Mart's third-party leave administrator for incapacity due to a workers' compensation related injury *and/or* time an associate was required to miss work in order to attend a medical appointment *or* receive treatment for a work-related injury. Manager Bradstreet did not consider time missed beyond that required to attend a medical appointment in connection with a workers' compensation

---

[5] Benson considered the "Wal-Mart One" website to be confusing and noted that it did not offer a category for workers' compensation absences or tardies.

[6] As discussed later, Benson proposed to the district court as an additional fact (though it reads more like an argument) that "workers' compensation" extended to missing work due to an illness caused by medication prescribed as *treatment* of a workers' compensation injury.

injury to be authorized under the Attendance Policy. Manager Bradstreet expected associates who missed work due to a workers' compensation medical appointment to be able to produce documentation of such appointment upon request.[7] Also, Bradstreet expected associates to schedule workers' compensation appointments during times when they were not scheduled to work; and, when this was not possible, to only miss so much of their shifts as necessary to travel, attend, and return from the appointment. On the other hand, Benson stated that Wal-Mart did not inform her that she should either schedule her appointments at times when she was not scheduled to work or only miss time necessary for traveling to and from a workers' compensation medical appointment.

Kathy Burns-Egan, the store's Personnel Coordinator, ("Coordinator Burns-Egan") was specifically asked, during a deposition for this litigation, whether an absence, due to complications in connection with medication for a work-related injury, would be excused under the Attendance Policy as a "workers' compensation" absence. Coordinator Burns-Egan responded that she "would not be able to answer that [because she] really [did not] know." Coordinator Burns-Egan acknowledged during her deposition "not remember[ing]" or "recall[ing]" whether the Windham store had

---

[7] It is unclear from the record how this was communicated, if at all, and this information was not written in the Attendance Policy.

- 9 -

any specific policy that employees must follow when notifying management about absences relating to a workers' compensation injury, but noted that it "[s]eems like there should have been [one]." When asked if she was aware of any written policy requiring any additional written verification with regard to workers' compensation absences or tardies, Coordinator Burns-Egan responded that "I don't recall it written. However, it was expected, so I'm not sure if it was written somewhere besides on [the Attendance Policy]."

## C. Benson's Absences

Once Benson returned to work as a People Greeter, attendance issues allegedly persisted. According to Wal-Mart's records, between October 14, 2016, and December 12, 2016, Benson was absent, left early, or arrived late to work on twelve occasions.[8] Benson missed a full—day shift on October 18, October 20, October 21, October 28, November 5, November 7, November 12, and November 28. She left more than 120 minutes early from her scheduled shifts on November 3, November 17, November 26, and December 8, 2016. In its internal recording system, Wal-Mart coded these absences, at least initially, as "unauthorized" under the Attendance Policy.

---

[8] For purposes of clarity, we shall refer to all absences (full or partial) including late or early arrivals as "absences" rather than "occurrences" as they are described in the Attendance Policy.

According to Benson, she partially or entirely missed a shift due to medical appointments to treat her work-related injury on October 18 and 20 as well as November 3 and December 8. On October 21 and 28 and November 5, 7, 12, 26, and 28, she missed her entire shift or left early due to illness or "bad reactions" (mostly upset stomach) caused by medications prescribed for her work-related injury. As to the November 17th absence, the parties stipulated that Benson used "vacation time."

Regarding the October 18 and 20 absences, Wal-Mart agrees that Benson informed store management of her appointments ahead of time. Regarding the November 3 and December 8 absences, Benson contends she gave notice to management prior to her appointment, but Wal-Mart disputes this fact. The record reflects that Benson gave advance notice for the November 3 absence, but did not provide notice for the December 8 absence. On December 8, Benson had arrived to work on time but left early and missed four hours of work time for a one-hour medical appointment. At the time, Benson had not offered Wal-Mart an explanation for this departure and, at her deposition in this case, could not explain why she missed four hours of work.

As to the October 21 and 28 and November 5, 7, 12, 26, and 28 absences, Benson stated during her deposition that she gave notice to management prior to each one. Wal-Mart contests that she followed the proper procedure for notifying these absences and

- 11 -

whether she, in fact, gave advance notice for missing her shift or leaving early. Wal-Mart also states that Benson informed management that the absences were related to having the flu. Benson clarified in her deposition testimony that the November 5 absence was not because she had the flu but rather because of a "bad reaction" to medication prescribed for her workers' compensation injury.

Overall, Wal-Mart does not dispute, for the purposes of summary judgment, that the reasons Benson eventually provided for these absences were true (i.e., Wal-Mart does not contest that Benson did indeed attend a chiropractor appointment when she claimed she did). However, Wal-Mart argues that, at the time of Benson's termination, management considered the absences to be "unauthorized," because Benson had not properly notified store management of the reason for an absence, because Benson never submitted proper documentation of treatment for her work-related injury, or because the proffered reason for an absence had not met the Attendance Policy criteria for an excused absence.

**D. Communication with Benson about Absences**

On December 12, 2016, Manager Bradstreet first noticed, while reviewing all associates' absences, that Benson had an "excessive number of occurrences" since returning to work in October 2016. Bradstreet arranged to meet with Benson to discuss these absences. According to Bradstreet, the purpose of the

meeting was to give Benson the opportunity to provide a satisfactory explanation for her absences. If Benson did not provide a satisfactory explanation, Manager Bradstreet would have proceeded to terminate her for violating the Attendance Policy. Benson was absent from most of her shifts that week and, hence, the two were unable to meet.

The next week, on December 17, 2016, Benson and Manager Bradstreet finally met. Benson explained that nearly all absences upon returning in October 2016 were due to her workers' compensation injury. She attributed the absences from December 12 and 16 to her car breaking down as result of a snowstorm. The record reflects that Benson requested and was approved to use PTO time on these dates. As to the December 15 absence, Benson explained that she had a medical appointment related to her workers' compensation injury. Wal-Mart contests whether she gave prior notice about the appointment.

Manager Bradstreet prepared a memorandum on December 17, 2016, following her meeting with Benson. In it, she noted they had discussed Wal-Mart's Attendance Policy because Benson seemed to be confused about how to properly notify workers' compensation absences. The memorandum also details that Benson expressed concern about receiving "mixed messages" from her workers' compensation attorney and Wal-Mart's management about required expectations when informing supervisors about an absence due to a

- 13 -

workers' compensation medical appointment. When Bradstreet asked Benson to provide medical documentation to support these absences, she indicated she could not do so during the meeting because her documentation was at home. At the meeting, Benson further complained about several aspects of how Wal-Mart was generally handling issues concerning her workers' compensation injury. Specifically, Manager Bradstreet detailed in the memorandum that:

> She complained about not being [able] to go [to] physical therapy because [Wal-Mart] would not approve it even though their independent doctor recommended she go. She has been waiting since June for therapy. She complained about her medication and not being able to get it filled however, when she takes it[,] it causes her to "lose control of her bowels and crap her pants" so she [cannot] be at work.

The memo continues that after Benson expressed this frustration, Bradstreet informed her that "going forward she needs to communicate to a member of management when she has appointments for [workers' compensation] ahead of time as soon as she is aware of the appointment." She also stressed that, when calling in, Benson "needs to speak to a member of management about why she is not at work that day." Bradstreet stated, in a sworn statement prepared for this litigation, that in light of Benson's explanation, Bradstreet held off terminating her.

During her deposition, Benson was asked to review and comment on Manager Bradstreet's memorandum. Benson recalled

feeling "very uneasy" during the meeting because she got "constant smirks" and "reactions" for not "saying what [Bradstreet] wanted." Benson acknowledged not being able to provide precise answers as to each absence since she did not have her absence sheet in front of her. She further explained that to avoid giving Bradstreet "false information," she instead gave Bradstreet permission to contact her workers' compensation attorney who had documentation for each medical appointment. As to complaining about the handling of her workers' compensation injury, Benson did not remember her exact words, but recalled generally expressing that the company "kept delaying me with everything." Benson explained that she "couldn't get a straight answer" about workers' compensation questions out of anyone from management; specifically, how to time clock "the way [they] wanted." Finally, Benson indicated that, following this meeting, she still did not understand what information store management required from her or if they were going to request information through her attorney. Benson expressed that after the meeting, she felt that "pretty much . . . the harassment started."

### E. More Communication and Harassment Allegations

On December 20, 2016, Benson sent an e-mail to Manager Bradstreet asking her to provide the dates on which Wal-Mart marked Benson as absent or tardy, so that Benson could further investigate the matter. This e-mail was in response to Bradstreet's inquiry

- 15 -

regarding Benson's medical records during the December 17 meeting. After receiving the list of absences and tardies, Benson prepared a list identifying the reason for each absence and sent it to her workers' compensation attorney. Benson expected that her workers' compensation attorney would forward this list to Wal-Mart's legal counsel and believed this did happen. The record lacks clear evidence about what action Benson's attorney took or what happened to this particular list.

Benson's meeting with Bradstreet and subsequent communication did not change the attendance issues. By early January 2017, Benson had missed a full shift on January 3 and arrived late on January 5. According to the record, Benson informed Wal-Mart—via e-mail and after the fact—that the January 3 absence was because of "bad reactions" to medication prescribed for the workers' compensation injury and that on January 5 she was absent because of a workers' compensation medical appointment.

On January 9, Coordinator Burns-Egan spoke to Benson about her January 5 absence. Benson explained that her doctor had ordered additional testing after her January 5 appointment, which caused her to be late. She also informed management about an upcoming medical appointment on January 13 and that, due to the appointment, she expected to arrive late to work. On January 13, 2017, upon arriving to the store after the appointment, Benson sent an e-mail to Bradstreet and Coordinator Burns-Egan stating

that: "Today I gave Kathie a copy of my M[-]1 form from Dr. Parris and asked for assistance in my time as there was an error. I punched in at 9:23, went to lunch at 9:25 and returned from lunch at 10:24. This is in all relation to workers' comp injury."[9] The "error" of which Benson speaks appears to be the coding of absences as "unauthorized" where Benson thought the absences ought to be authorized. In response to the message, Coordinator Burns-Egan and Manager Bradstreet met with Benson in-person and discussed her late arrivals. The record contains divergent versions as to what precisely occurred in the meeting.

According to Benson, she was following "Wal-Mart's protocol" and not going to work until after her medical appointment (at 8:30 a.m.) although her shift was scheduled two hours before the same (at 6:00 a.m.). Benson testified that Bradstreet was "very nasty," "rude," and even "screamed" at her. At all times, Benson insisted that she always followed the store's notice protocol.

According to Bradstreet, she asked Benson whether Benson was paid to sit on a couch from 6:00 a.m. to 7:30 a.m., even though she was scheduled to work. Benson responded that it "cost too

_____

[9] An "M-1" form is a "Diagnostic Medical Report" completed by medical providers treating those with injuries sustained at work, whose treatment is covered by workers' compensation. The "M-1" form is required by the Maine Workers' Compensation Board. See 39-A M.R.S.A. § 208.

much in gas" to go to work first, then to her medical appointment, and return to work, so she stayed home and "got ready" for work, per her attorney's instructions. When the meeting concluded, Bradstreet expressed to Benson "significant concern" regarding her absences and how she was missing more days than necessary. As a result, the January 5 and 13 absences were coded as "conditional status" pending Benson's production of medical documentation, presumably meaning these absences were conditionally authorized.

On January 19, Benson and Bradstreet met again to further discuss Benson's absences and medical documentation. The next day, Benson sent an e-mail to Market Human Resources Manager Wayne Gottwald ("HR Manager Gottwald") and Coordinator Burns-Egan indicating that:

> Because of the work injury and because of the actions that were taken by Susan Bradstreet numerous times yesterday, January 19th, I am feeling more and more that I am feeling harassed. If you need a further explanation, I or my attorney can respond. The harassment needs to stop. It is illegal and unfair.

In their depositions, HR Manager Gottwald and Coordinator Burns-Egan each admitted that an e-mail of this nature, according to Wal-Mart's policy, would have required immediate action and would have initiated an investigation into any possible acts of discrimination or retaliation. HR Manager Gottwald explained that if he had been made aware of this e-mail, he would have had the responsibility to gather facts, provide these to Wal-Mart's ethics

team, and render a determination if further investigation was needed. However, the record contains no evidence that anyone at Wal-Mart actually took action concerning Benson's discrimination complaint. At their depositions, neither HR Manager Gottwald nor Coordinator Burns-Egan recalled receiving this e-mail. Similarly, Manager Bradstreet said she was unaware of the e-mail until the day her deposition was taken as part of discovery in this case.

### F.    More Absences and Benson's Firing

On January 26, 2017, Benson arrived late to work because of a medical appointment related to her workers' compensation injury. On or about this date, she submitted a medical form indicating that she could only work every other day because of her workers' compensation injury. On January 31, 2017, Wal-Mart adjusted Benson's schedule so that she would work only every other day, consistent with her doctor's restriction.

On February 8, 2017, Benson was absent from her shift. Using the web-based platform, she informed the store that she would miss work due to a snowstorm. Benson requested her absence to be covered by her PTO, which appears to be permitted by the Attendance Policy's terms. In her deposition, Benson stated that because she had to shovel snow that day, her workers' compensation injury was aggravated.

On February 10, 2017, Benson arrived late for work due to a workers' compensation medical appointment. On this occasion,

- 19 -

she did not provide advance notice, but rather gave Coordinator Burns-Egan the medical record of her appointment upon her arrival. On February 16, 2017, Benson was absent from her shift. She says that, using the web-based call-in procedure, she reported that said absence was due to snow.

Manager Bradstreet consulted with HR Manager Gottwald regarding Benson's termination. He declined to support the termination and instead referred the decision to Wal-Mart's legal counsel because of her previous lawsuit, Benson I. Specifically, HR Manager Gottwald testified that: "I was asked if I would be willing to support terminating her because she had exceeded the absence number that was allowed by the company. And as I also recall, I did not approve the termination at that time." When asked why he did not approve the termination, he stated that "[b]ecause it was in the hands of the legal team and it was not my decision to make." Furthermore, when questioned who made the decision to terminate Benson, HR Manager Gottwald explained that "I believe it was made at the legal level either -- I don't know if it was made by the [Wal-Mart] attorney or the home office corporate attorney."

On February 18, 2017, Wal-Mart terminated Benson. In the "Separation Notice" Manager Bradstreet documented the alleged basis for the termination as follows:

Margaret has been repeatedly asked to communicate absences and tardies to store management. She has chosen not to do this. She is being terminated for 21 attendance exceptions; policy allows for 9.

## G.    District Court Proceedings

Following her termination, in November 2018, Benson sued Wal-Mart in state court alleging disability discrimination and retaliation under Maine state law. Benson argued that, pursuant to the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4572, Wal-Mart discriminated against her based on medical disability and terminated her because of a workers' compensation injury. She further asserted that her firing occurred in retaliation for engaging in activities protected under the Maine Whistleblower Protection Act ("MWPA"), Me. Rev. Stat. Ann. tit. 26, § 833(1)(B), and related provisions of the MHRA.

Following removal of the case to federal district court, discovery, and motions practice, the district court issued an order granting summary judgment in Wal-Mart's favor concluding that Benson "failed to generate a genuine issue of material fact concerning the first element of her disability discrimination claim." Benson v. Wal-Mart Stores East, L.P. ("Benson II"), No. 19-cv-41 (LEW), 2020 WL 1669851, at *6 (D. Me. Apr. 3, 2020). Specifically, regarding the disability discrimination claim, the district court ruled that Benson's argument suffered from a "fatal flaw" because she failed to show she is a "qualified individual"

- 21 -

under MHRA. Id. at *5. To arrive at this conclusion, it analyzed whether she could "perform the essential functions of her job" and if not, whether "she identified any reasonable accommodation that would enable her to perform those functions[.]" Id. The district court held that the "need for attendance [was] self-evident" and, thus, an essential function of the People Greeter job, and that there was no evidence to support any reasonable accommodation that would have allowed Benson to attend work. Id. at *6. As to the retaliation claim, the district court concluded Benson failed to adduce sufficient proof to show causation between the proffered protected activities and her termination and whether Wal-Mart's explanation for Benson's termination was pretextual. Id. at *8.

This appeal followed.

### III. Discussion

On appeal, Benson posits that the district court erred in finding, as a matter of law, that she was not a "qualified individual" under MHRA and failed to establish the elements of her retaliation claim, pursuant to MHRA and MWPA. We begin with addressing whether summary judgment was appropriate on Benson's disability discrimination claim and then turn to her retaliation claims.

### A. Disability Discrimination

The MHRA provides that "[t]he opportunity for an individual to secure employment without discrimination because of

- 22 -

. . . physical or mental disability . . . is recognized as and declared to be a civil right." Me. Rev. Stat. Ann. tit. 5, § 4571. The Maine Law Court recognizes that "[f]ederal law guides [its] construction of the MHRA." Cookson v. Brewer Sch. Dep't, 974 A.2d 276, 281 (Me. 2009); see also Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 n.12 (1st Cir. 2013) ("[D]isability-related claims under the MHRA are construed and applied along the same contours as the [Americans with Disabilities Act (ADA)]") (internal quotation marks and citations omitted).

In cases such as the present, the plaintiff must establish a prima facie case of discrimination, and, if satisfied, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action. Ultimately, the plaintiff must come forward with evidence of pretext. See Collazo-Rosado v. U.P.R., 765 F.3d 86, 92 (1st Cir. 2014).

### 1.   Prima Facie Case of Discrimination

Mirroring the ADA, to establish a prima facie case of disability discrimination under MHRA, Benson must show that: "(1) [she] has a disability; (2) [she] is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of [her] job; and (3) [her] employer adversely treated [her] based in whole or in part on [her] disability." Daniels v. Narraguagus Bay Health Care Facility, 45 A.3d 722, 726 (Me. 2012). This stage of the case is not supposed to be burdensome. Lockridge

v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010) (noting that prima facie discrimination inference requires only a "modest" showing); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 44 (1st Cir. 1999) (noting that initial prima facie requirements are not especially "onerous" (quoting Brennan v. GTE Gov't Sys. Corp., 150 F. 21, 26 (1st Cir. 1998))).

There is no dispute that Benson has a disability (required by the first element) and that she was eventually fired (the adverse treatment from the third element). The central question, the parties and the district court agree, is about the second element—is Benson qualified for the job? Pursuant to the MHRA, a "qualified individual with a disability" is defined as "an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." Me. Rev. Stat. Ann. tit. 5, § 4553(8-D). We thus focus our analysis on whether attendance is an "essential function[]" of the People Greeter job and then turn to whether Benson can perform that function with a "reasonable accommodation."

*Is Attendance an Essential Function of the Job?*

An essential function is "fundamental" to the position in question. Sepúlveda-Vargas v. Caribbean Rests., LLC, 888 F.3d 549, 553 (1st Cir. 2018) (quoting Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001)). "The term does not include 'marginal' tasks,

- 24 -

but may encompass 'individual or idiosyncratic characteristics' of the job." Id. (quoting Ward v. Mass. Health Res. Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000)). When determining whether a function is "essential," we consider factors such as the written requirements or description of the job and the consequences of not requiring the function. 29 C.F.R. § 1630.2(n)(3); accord Ward, 209 F.3d at 34. We are not tasked with second-guessing an employer's legitimate business judgment about what is required of its employees, but we will consider whether the employer actually enforces this requirement of its employees or merely pays it lip service during litigation. See Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 25 (1st Cir. 2002); see also Jones v. Walgreens Co., 679 F.3d 9, 14 (1st Cir. 2012) (noting that courts give a "significant degree of deference to an employer's own business judgment" about the necessities of a given job). Of particular relevance here, we have noted that regular attendance "is an essential function of any job." Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 33 (1st Cir. 2011) (internal quotation marks omitted); accord EEOC v. Ford Motor Co., 782 F.3d 753, 761 (6th Cir. 2015) ("That general rule—that regularly attending work on-site is essential to most jobs, especially the interactive ones—aligns with the text of the ADA.").

Benson argues the record permits the conclusion that regular attendance is not an essential function of the People

Greeter job, which is all Benson would need at this stage of the litigation to survive summary judgment. In support of this argument, Benson notes that, in its briefing before the district court, Wal-Mart only cited two facts in support of the idea that attendance is an essential function of this job: (1) Wal-Mart only scheduled one People Greeter to work at each entrance at a time and (2) therefore, if that People Greeter was absent, the People Greeter's tasks went unfulfilled. Benson contends that these related facts are disputed and are insufficient as matter of law to support a holding that regular attendance is not an essential function of this job. Further, as Benson sees it, Wal-Mart submitted no evidence of "written job descriptions, consequences of not requiring the function, work experience of past incumbents, and work experience of current incumbents," Ward, 209 F.3d at 34 (citing 29 C.F.R. § 1630.2(n)(3)), without which the district court could not properly analyze the essential-function question using those factors we have found to be important.

As to Benson's first argument, there is a difference between an "essential job" and an "essential function" of a given job. Wal-Mart may not consider the People Greeter position as an "essential job," as some parts of the record reflect that the position often went unfilled, but this does not imply that "attendance" fails to be an "essential function" of this job. Even if Wal-Mart scheduled more than one People Greeter to work at each

entrance, as Benson says it did, that, on its own, appears to show that Wal-Mart valued having People Greeters present in the store, necessitating attendance. Benson's second argument, that there was no evidence that Wal-Mart considered attendance to be an essential function of the People Greeter role, is similarly unsupported by the record. This claim ignores the text of the Attendance Policy which says that "regular and punctual attendance is a required and essential function of each associate's job." See Jones, 679 F.3d at 14; see also 29 C.F.R. § 1630.2(n)(3).

Above all, Benson cannot perform any of the functions of a People Greeter outside of the hours or location assigned by Wal-Mart and so, showing up is an essential function of that job. See Ward, 209 F.3d at 35-36; see also Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213-14 (4th Cir. 1994) (holding that attendance during assigned class times is an essential function of job as a teacher).

*Can Benson Perform the "Essential Function" of Attendance with a Reasonable Accommodation?*

Having determined that attendance is an essential function of the People Greeter position, we consider whether Benson could perform that function (that is, attend work) with a reasonable accommodation. The ADA requires an employer "to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability

who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on [its] operation of the business.'" Ortiz-Martínez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 604 (1st Cir. 2017) (quoting 42 U.S.C. § 12112(b)(5)(A)). To prevail in her claim, Benson bears the burden of showing that (1) she has made a sufficient request of accommodation, (2) the accommodation would enable her to perform the essential functions of her job, and (3) the accommodation is facially reasonable. Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 127 (1st Cir. 2017).

There is no credible debate that Benson requested an accommodation. Upon her return from leave in October of 2016, Benson informed management that she would have regularly scheduled medical appointments for her work-related injury and Supervisor Little told Benson that "as long as [she] gave her notice [to the store's Personnel Coordinator] of when the time frame was, that they would take care of it and make [her] schedule fit accordingly."

Nor is there any reasonable argument that authorizing some absences or tardiness would not enable Benson to show up the rest of the time. Wal-Mart argues that Benson fails to show "that [accommodating] her poor attendance would make it possible for her to heal, to adjust her medication in order to better control her pain, or to accomplish anything else that would enable her to come

- 28 -

to work as scheduled." This, however, misses the point of Benson's sought accommodation, which is akin to a modified work schedule where she is excused from working when her disability necessitates treatment. Indeed, a modified work schedule is a classic reasonable accommodation, considered by the ADA. 42 U.S.C. § 12111(9)(B).

The decisive factor ultimately is whether Benson's requested accommodation is "facially reasonable." See Echevarría, 856 F.3d at 127. Wal-Mart makes an understandable point that it needs People Greeters to show up in order to do their jobs and that Benson cannot always do that. However, more persuasive than Wal-Mart's arguments on appeal is Wal-Mart's own Attendance Policy, which says that any tardiness or absence related to workers' compensation is permitted. Further, the Attendance Policy also explicitly considers any missed time due to a "reasonable accommodation" to be permitted as well.

Mindful that the prima facie case is not difficult to make out, we conclude that Benson has done enough and so the burden shifts to Wal-Mart to articulate a legitimate non-discriminatory reason for Benson's termination.

### 2. Legitimate Non-Discriminatory Reason and Pretext

Benson appears to agree that Wal-Mart's proffered reason for her termination—excessive unexcused absences—is, on its face, a legitimate non-discriminatory reason for her firing. She argues

that this reason is pretextual, positing that if her absences were authorized by the terms of the Attendance Policy, and, thus, she indeed complied with the written and unwritten Attendance Policy, then her termination for excessive unexcused absences was pretextual.

"[T]here is no mechanical formula for finding pretext." Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003) (quotation marks and citations omitted). However, we have noted that "[o]ne way to show pretext is through 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and with or without the additional evidence and inferences properly drawn therefrom infer that the employer did not act for the asserted non-discriminatory reasons.'" Billings v. Town of Grafton, 515 F.3d 39, 55-56 (1st Cir. 2008) (citations and alteration omitted). The record contains enough facts (however disputed) that make summary judgment inappropriate on these claims.

Benson puts forward evidence that most of her absences should have been coded as "authorized" because they were related to her workers' compensation injury and further followed what she understood to be Wal-Mart's policy for notifying management of

such absences. Two grey areas in the record support Benson's pretext argument and preclude summary judgment for Wal-Mart.

First, it is at best unclear as to whether an illness and side-effects from medications prescribed for *treating* a workers' compensation injury could be excused under the Attendance Policy. As per Coordinator Burns-Egan's deposition testimony, this material fact can neither be confirmed or denied. When questioned about the matter, Coordinator Burns-Egan responded that she "would not be able to answer that [because she] really [did not] know" if an illness related to side-effects from a workers' compensation injury medications would be excused under the Attendance Policy. Whether store management even understood the contours of the policy upon which it based its termination of Benson is hence disputed.

Second, the record is, at best, murky as to whether Benson was indeed aware of Wal-Mart's unwritten job expectations, if they existed at all, regarding documentation of worker's compensation treatment or obtaining permission from management before missing a shift. Similarly, as per Coordinator Burns-Egan's deposition testimony, she did "not remember" nor "recall" whether the Maine Windham store had a particular policy as to this material fact, even though she acknowledged that "there should have been [one]."

The record as a whole inures to Benson's benefit, helping her point out the "implausibilities, inconsistencies, incoherencies, or contradictions," Billings, 515 F.3d 55, in Wal-Mart's proffered reason for her termination. It is impossible to unequivocally conclude that Wal-Mart internally established that Benson in fact exceeded the store's allowed number of authorized absences, which casts enough doubt in Benson's favor.

Viewing all of these facts in the light most favorable to Benson, the record contains enough to generate genuine issues of material fact insofar as the reason proffered for Benson's termination being pretextual. This is all Benson needs at this point.

**3. Inapplicability of Maine Caselaw Precedent:  Carnicella**

As a final matter, we differ from the district court's reliance on Carnicella v. Mercy Hosp., 168 A.3d 768 (Me. 2017). In Carnicella, the plaintiff had explicitly requested leave and further extensions to said leave as a means to recover from an injury before returning to work.  The Maine Law Court held that the only accommodation requested in Carnicella, leave of absence, was unreasonable as a matter of law because, at the time, the MHRA contemplated a defense that an employer could discharge an employee with disabilities who could not perform the duties of the

employment.  Carnicella, 168 A.3d at 774.[10]  As a result, this rendered any additional leave as an unreasonable accommodation under Maine law.

In this case, there are genuine issues of material facts as to whether Benson, who had a disability and requested a reasonable accommodation for it, could indeed perform the duties of her job.  Thus, the statutory defense invoked in Carnicella, at this stage of the proceedings, is inapplicable.  Moreover, if these factual disputes were to be resolved in Benson's favor, then the record shows that she understood what an authorized leave of absence implied because she had requested the same before returning to work on October 2016.  On this occasion, she knowingly did not

---

[10] The MHRA was amended in 2019 to add "leaves of absence" to the list of accommodations in the statutory definition of "reasonable accommodation."  2019 Me. Legis. Serv. Ch. 464 (H.P. 1216) (L.D. 1701) (WEST).  Although this amendment became law after the present case was filed, it bears no weight in our analysis. Following the fundamental rule of statutory construction, the Maine Law Court has held that "all statutes will be considered to have a prospective operation only, unless the legislative intent to the contrary is clearly expressed or necessarily implied from the language used."  Morrill v. Me. Tpk. Auth., 983 A.2d 1065, 1067 (Me. 2009) (citing Terry v. St. Regis Paper Co., 459 A.2d 1106, 1109 (Me. 1983)).  Similarly, the Supreme Court has held that "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly" and thus "'the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'"  Landgraf v. USI Film Products, 511 U.S. 244, 265 (1994) (citing Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 855 (1990) (Scalia, J., concurring)).  Neither of the exceptions detailed by the Maine Law Court are present here.

request leave, as defined under the Attendance Policy, in relation to her workers' compensation injury. Her reasonable accommodation, as explained above, was not for a request of "intermittent leave" as Wal-Mart advanced. The record does not contain evidence that Benson ever made such a request as Wal-Mart so characterized.[11]

## B. Retaliation

Under both MHRA and MWPA, Benson has to establish that: (1) she engaged in protected activity; (2) she suffered a materially adverse action or was adversely affected, and (3) there was a causal connection between the protected activity and the adverse action. See Brady v. Cumberland Cty., 126 A.3d 1145, 1150-51 (Me. 2015); Ramsdell v. Huhtamaki, Inc., 992 F. Supp. 2d 1, 20 (D. Me. 2014). When reviewing Maine MWPA claims, we "collapse the more intricate McDonnell Douglas framework and, in a seamless inquiry, 'recognize any evidence that the employer had a lawful reason for the adverse action taken against the employee, and any evidence that the proffered reason is merely a pretext.'"

---

[11] We note that it seems contradictory that Wal-Mart on the one hand argues that Benson was required to make a "direct and specific" request for leave of absence to comply with the Attendance Policy, yet also averred before the courts that leave of absence was not a "reasonable accommodation" under Maine law. We disavow Wal-Mart's "attempt[] to eat [its] cake and have it, too." State St. Bank & Tr. Co. v. United States, 313 F.2d 29, 31 (1st Cir. 1963).

Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 350 (1st Cir. 2018) (quoting Brady, 126 A.3d at 1157-58).

The case law and the parties agree that the causation element is the center of the dispute. Under the Maine-specific causation paradigm, "[t]o demonstrate a causal link sufficient to defeat a summary judgment motion" on a retaliation claim, Benson must make a sufficient evidentiary showing that her protected activity "was a substantial, even though perhaps not the only, factor motivating her dismissal." Id. at 349; see also Caruso v. Jackson Lab., 98 A.3d 221, 226 (Me. 2014).

As previously discussed, in this case, the district court concluded that none of the actions Benson raised, if considered as protected activity, were causally connected to her termination. Benson II, 2020 WL 1669851, at *7-8. We disagree and hold that the facts viewed in the light most favorable to Benson could lead a reasonable factfinder to conclude that Benson's first employment discrimination lawsuit, the January 20 e-mail complaining of harassment, and her late January request for a reasonable accommodation of a modified schedule could have been "substantial" factors motivating her dismissal.

When we view the facts and inferences in the light most favorable to Benson's legal theory, several facts line up in her favor. First, the timing of the January e-mail and request for a modified schedule does not fare well for Wal-Mart. As Benson tells

- 35 -

it, Bradstreet screams at her for missing work in mid-January, Benson complains of this harassment and requests a modified schedule in the weeks after that, and then, by mid-February, she is fired.  On its own, the temporal proximity between the January e-mail and accommodation request and Benson's February 18 termination is sufficient to make out a prima facie case, but the inference is even stronger alongside HR Manager Gottwald's complete inaction in response to Benson's harassment claim.  See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (explaining that "temporal proximity must be 'very close' to satisfy evidence of causality in prima facie case of retaliation); Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997) (noting "the larger sequence of events" for the causation element). Rather than initiate some sort of investigation as required by Wal-Mart protocols, Gottwald elected not to act, even in the face of Bradstreet, the alleged harasser, attempting to fire Benson, her alleged victim.

Benson's first lawsuit, filed nearly one year prior to her termination, may be too remote to demonstrate any causation, but the inference from the January events is too strong to ignore, especially when dealing with as low a bar as a prima facie case. These pieces together are enough for Benson to make out a prima facie case.  See Soileau, 105 F.3d at 16; accord Oliver v. Digital

Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988) (considering the entire sequence of events for causation questions).

The January 20 e-mail is also critical. The district court relied on Pomales v. Celulares Telefónica, Inc., 447 F.3d 79 (1st Cir. 2006), to support its reasoning that because the decisionmaker, Manager Bradstreet, was unaware of the e-mail, it could not be considered as the "but-for" cause of Benson's firing. The record, however, contains evidence indicating Bradstreet was not the only decisionmaker in Benson's termination process. Manager Bradstreet consulted HR Manager Gottwald, one of the recipients of the January 20 e-mail that complained about harassment.[12] HR Manager Gottwald recommended the matter be referred to Wal-Mart's legal team, who, according to HR Manager Gottwald, ultimately made the final decision to terminate Benson. In short, whether or not Bradstreet knew of the contents of the e-mail is not fatal to Benson at this stage.

---

[12] Benson testified that she included HR Manager Gottwald on the e-mail complaining about Manager Bradstreet. Though Gottwald could not recall whether he had received the e-mail, Benson testified that she had sent it to him. Whether HR Manager Gottwald read the e-mail or not is a matter of credibility best suited for a jury. See Ahmed v. Johnson, 752 F.3d 490, 502 (1st Cir. 2014) ("Determining which view more accurately reflects reality requires factfinding and credibility judgments that are properly the task of a jury."); United States v. Sepúlveda-Hernández, 752 F.3d 22, 30 (1st Cir. 2014) ("[I]t is the jury's role—not the role of an appellate court—to determine the weight to be given to a witness's testimony and to assess the witness's credibility.").

With the prima facie case in Benson's favor, we move on to the legitimate non-discriminatory reason and pretext aspects of the claim. Because we have already concluded that Benson can sustain an argument that Wal-Mart's proffered reason for her termination was pretextual, we need not go any further.

## IV. Conclusion

For the foregoing reasons, we <u>reverse</u> the district court's judgment entered on April 3, 2020, and <u>remand</u> for further proceedings consistent with this opinion. Costs awarded to Benson.